MASSACHUSETTS SCHOOL OF
LAW AT ANDOVER, INC.,
Plaintiff, Appellant,

v.

AMERICAN BAR ASSOCIATION,
et al., Defendants, Appellees.

No. 97–1926.

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 1998.

Decided April 24, 1998.

Michael L. Coyne, with whom Peter M. Malaguti was on brief, for appellant.

Joseph L. Kociubes, with whom Peter J. Mancusi, Bingham, Dana LLP, David T. Pritikin, David R. Stewart, Sidley & Austin, Darryl L. DePriest, and Catherine A. Daubard were on brief, for appellees American Bar Association and affiliated individuals.

Vincent M. Amoroso, with whom Peabody & Arnold, Robert A. Burgoyne, and Fulbright & Jaworski L.L.P. were on brief, for appellee Association of American Law Schools.

James R. DeGiacomo, with whom Judith K. Wyman and Roche, Carens & DeGiacomo, P.C. were on brief, for appellee New England School of Law.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

The lawsuit that undergirds this appeal pits a fledgling law school, built on a foundation of unconventional premises, against the legal establishment. The gargantuan record, capable of inducing tapephobia in even the hardiest appellate panel, is forbidding, but sheer bulk rarely is an accurate proxy for complexity. Having scaled the mountain of papers and obtained a clear view of the legal landscape, we conclude that the lower court correctly apprehended both the issues and the answers. Consequently, we uphold the several rulings that the appellant so vigorously contests.

## I. THE PROTAGONISTS

In late 1995, Massachusetts School of Law (MSL) sued the American Bar Association (the ABA), the American Association of Law Schools (the AALS), New England School of Law (NESL), and fourteen individual defendants. The facts that inform MSL's wideranging allegations are too diffuse to shed much light at this juncture, so we leave them shuttered until they can illuminate the specific issues raised by this appeal. We deem it helpful, however, to describe at the outset

the institutions and individuals involved in the litigation.

We begin with MSL, a non-profit institution that opened its doors in 1988. The school's self-proclaimed mission is to provide high-quality, affordable legal education to capable persons who traditionally have been shut out of the legal profession, including members of disadvantaged demographic populations and persons turning to the law in search of a second career. To this end, MSL does not require applicants to take the Law School Aptitude Test (LSAT) because it considers the test biased. Moreover, MSL's curriculum features a higher-than-usual percentage of adjunct instructors and a concentrated focus on professional skills courses. MSL is not a fully accredited law school, but in 1990, the Massachusetts Board of Regents authorized the school to award the J.D. degree and thereby enabled MSL graduates to sit for the Massachusetts bar.

The ABA is the largest national organization of the legal profession. It has a membership of more than 380,000, composed principally of practicing lawyers (including lawyers in government and corporate America), judges, court administrators, and legal educators. Though the ABA does not have the power to discipline lawyers, it promulgates model rules, develops guidelines, and strives to function as the national voice of the legal profession. In that capacity, it long has served as the chief accreditor of law schools.

The AALS is a non-profit association of 160 law schools. Its stated objective is "the improvement of the legal profession through legal education." It serves as a trade organization for law professors and, with reference to legal education, acts as the academy's principal representative to the federal government and to national higher education organizations. The AALS is separate from the ABA, but the two informally interlock in various ways. Many individuals are active in both organizations and many AALS members participate in the ABA accreditation process.

The fourteen individual defendants divide into two groups. One group (the Eight Individual Defendants) comprises the seven members of the ABA's Accreditation Committee (the Committee) plus the immediate past chair of the ABA's Section of Legal Education and Admissions to the Bar (the Section). The other group (the Six Individual Defendants) comprises the five members of the ABA team that visited MSL during its unsuccessful effort to obtain accreditation, plus a consultant who advised the ABA during that process. All fourteen individual defendants are active participants in accreditation-related matters.

NESL is an ABA-accredited law school located in Boston, Massachusetts. MSL regards itself as a competitor of NESL—and one which, if accredited, would be all the more formidable.

## II. THE ACCREDITATION PROCESS

For more than 70 years, the ABA has promulgated the standards for law school accreditation (the Standards). It is widely believed among legal educators and regulatory organizations that compliance with the Standards enhances the quality of legal education. MSL disputes this conventional wisdom but, since 1952, the United States Department of Education (the DOE) has recognized the ABA as a "reliable authority" anent the quality of legal education and has designated it as the relevant accrediting body. 20 U.S.C. § 1099b(a).[1] As a result of this recognition, ABA-accredited schools are eligible to participate in federal student loan programs. See 20 U.S.C. § 1141(a)(5). Accredited institutions also receive various state-based benefits, not the least of which is that all fifty states, the District of Columbia, and the Commonwealth of Puerto Rico deem graduation from an ABA-accredited institution sufficient to satisfy the legal

---

1. Federal law provides criteria by which a DOE-approved accreditor must review an applicant institution. See 20 U.S.C. § 1099b(a)(5) (requiring the accreditor to assess the institution's curricula, faculty, physical facilities, fiscal stability, student services, program length, degrees offered, and history of student complaints). The Standards faithfully track section 1099b's framework.

education requirement for admission to the bar.

The accreditation process works something like this. A law school may apply for ABA accreditation after three years of operation. Its application must include a self-study, delineating its perception of its present and projected compliance with the Standards and explaining any deviations from them. The Committee reviews each application and appoints a site-visit team to conduct interviews and inspect the applicant's physical plant. This team reports its findings to the Committee. If the Committee determines that the school is in compliance with the Standards, the accreditation process moves forward. If a school is found not to be in compliance with the Standards, the Committee nonetheless may recommend provisional accreditation if it receives satisfactory assurances that the applicant will achieve compliance within three years. *See* Standard 104(a).

In the absence of compliance (actual or anticipated), there is another potential route to accreditation: the applicant may request a variance from the Standards, and the body that oversees the accreditation process, the Council of the Section (the Council), may choose to grant it as a matter of discretion. Standard 802 governs the variance procedure. Because this Standard is central to MSL's accreditation effort, we reprint it in full:

> A law school proposing to offer a program of legal education contrary to the terms of the Standards may apply to the Council for a variance. The variance may be granted if the Council finds that the proposal is consistent with the general purpose of the Standards. The Council may impose such conditions or qualifications as it deems appropriate.

## III. MSL'S ACCREDITATION EFFORT

MSL applied for ABA accreditation in 1992. From the outset, MSL recognized that its practices were discordant with the Standards, yet remained steadfast in its deliberately contrarian mission.[2] At no time did MSL argue present compliance with the Standards or promise future compliance. Instead, it confessed in its self-study that "[t]o the considerable extent MSL's goals and methods are innovative, sometimes they deliberately run counter to conventional ABA criteria of accreditation." Not surprisingly, MSL invoked Standard 802 by letter dated January 27, 1993, and requested "a waiver of each and every Standard that ... might bar accreditation" on the ground that, despite its admitted lack of conformity, "MSL provides a high quality legal education that meets the underlying objectives of the accreditation process."

An ABA team visited MSL's campus in April 1993. The next month, the site-visit team recommended that the Committee deny accreditation because MSL was in default of myriad Standards.[3] The Committee accepted the recommendation and rejected the application. MSL successively appealed to the Council and to the ABA's House of Dele-

---

2. There is some suggestion that MSL thought it could cow the ABA into granting accreditation despite its lack of compliance. In a 1992 memorandum from Dean Lawrence Velvel to members of MSL's board of trustees, the dean predicted that if the ABA "is given reason to believe it is facing a tiger, it will seek to quickly come to a reasonable accommodation with MSL." He then noted that "[t]he ABA ran a deficit of two million dollars last year, and is in desperation about insufficient revenues.... The ABA's financial straits are crucially important because ... the lawyers needed to defend serious lawsuits cost a small fortune. The ABA will not want and cannot afford the heavy fees it would have to spend to defend against a suit by MSL."

3. Areas of noncompliance included (1) an inordinately high student/faculty ratio; (2) the school's excessive reliance on part-time faculty; (3) the unusually heavy teaching loads carried by full-time faculty members; (4) the failure to provide sabbaticals for full-time faculty; (5) the inclusion of six-credit bar review courses in the school's curriculum; (6) the lack of a suitable placement program; (7) problems with MSL's class schedule; (8) the absence of any policies designed to ensure that full-time MSL students devote substantially all their working hours to the study of law; (9) the failure to use LSATs or some other acceptable testing mechanism to determine apparent aptitude for legal study; (10) the absence of any written plan for achieving compliance with Standard 212 (requiring "concrete action" to provide legal education to qualified members of groups that "have been victims of discrimination in various forms"); and (11) an inadequate physical plant.

gates, both of which upheld the denial of accreditation.

## IV. PROCEDURAL HISTORY

Although the instant litigation has all the hurly-burly of a major engagement, it is in point of fact a rear-guard action. In November 1993, MSL brought an antitrust suit against the ABA, the AALS, and twenty-one individual defendants (including twelve of the fourteen persons sued here) in the United States District Court for the Eastern District of Pennsylvania. The Third Circuit subsequently characterized MSL's complaint as alleging that the named defendants conspired "to enforce the ABA's anticompetitive accreditation standards [and thus violated the Sherman Act] by: (1) fixing the price of faculty salaries; (2) requiring reduced teaching hours and non-teaching duties; (3) requiring paid sabbaticals; (4) forcing the hiring of more professors in order to lower student/faculty ratios; (5) limiting the use of adjunct professors; (6) prohibiting the use of required or for-credit bar review courses; (7) forcing schools to limit the number of hours students could work; (8) prohibiting ABA-accredited schools from accepting credit transfers from unaccredited schools and from enrolling graduates of unaccredited schools in graduate programs; (9) requiring more expensive and elaborate physical and library facilities; and (10) requiring schools to use the LSAT." *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026, 1031–32 (3d Cir.) (*MSL I*), *cert. denied*, —— U.S.——, 118 S.Ct. 264, 139 L.Ed.2d 191 (1997). Between 1994 and 1996, the district court published no fewer than nine opinions.[4] At the end of the line, the district court entered summary judgment in favor of all remaining defendants (including the ABA and the AALS), and the Third Circuit affirmed. *See id.*

With the antitrust case still extant, MSL sought to try its luck in the Massachusetts state courts. Its suit named the ABA, the AALS, twelve of the same individuals whom it had sued in *MSL I*, and three virgin defendants (NESL and two additional Committee members, Moeser and Yu). MSL's complaint asserts claims for violation of Mass. Gen. Laws ch. 93A and for tortious misrepresentation against all the defendants, as well as claims for fraud, deceit, civil conspiracy, and breach of contract against the AALS, the ABA, and the fourteen named individuals. The strand that sews together this tapestry of charges is MSL's accusation that the ABA and the AALS for many years have banded together to monopolize legal education with a goal of increasing their institutional power and boosting the salaries of law professors and administrators. MSL asserts that its educational philosophy poses a threat to the ABA/AALS cabal and that the two organizations therefore conspired to deny MSL accreditation, despite the fact that MSL's educational offerings are exemplary.

Invoking 20 U.S.C. § 1099b(f), discussed *infra* Part V, the defendants removed the case to the United States District Court for the District of Massachusetts. The district court denied MSL's timely motion to remand. After a full year's worth of pretrial skirmishing, the court methodically dismembered MSL's complaint, defendant by defendant, during a four month period in 1997: on January 10, it granted NESL's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6); on February 13, it granted the Eight Individual Defendants' motion to dismiss for lack of personal jurisdiction; on March 3, it granted the AALS's motion for summary judgment; and on May 8, it granted summary judgment in favor of the ABA and the Six Individual Defendants. MSL appeals from each of these rulings.

---

**4.** *See Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 846 F.Supp. 374 (E.D.Pa. 1994) (dismissing claims against certain individual defendants for lack of personal jurisdiction); 853 F.Supp. 837 (E.D.Pa.1994) (resolving controversies anent discovery); 853 F.Supp. 843 (E.D.Pa.1994) (denying plaintiff's motion for reconsideration); 855 F.Supp. 108 (E.D.Pa.1994) (granting in part defendants' motions for sum- mary judgment); 857 F.Supp. 455 (E.D.Pa.1994) (reconsidering discovery orders); 872 F.Supp. 1346 (E.D.Pa.1994) (denying plaintiff's recusal motion); 895 F.Supp. 88 (E.D.Pa.1995) (reaffirming earlier decision); 914 F.Supp. 1172 (E.D.Pa.1996) (imposing sanctions); 937 F.Supp. 435 (E.D.Pa.1996) (granting remaining defendants' dispositive motions).

We first address two threshold jurisdictional issues: the refusal to remand and the court's holding that it lacked jurisdiction over the Eight Individual Defendants. From that point forward, we proceed on a defendant-by-defendant basis.

## V. THE MOTION TO REMAND

■ The court below denied MSL's motion to remand, ruling that the suit arose under federal law. *See* 28 U.S.C. § 1331 (1994); *see also Viqueira v. First Bank,* 140 F.3d 12, 17–19 (1st Cir.1998) (discussing federal question jurisdiction). Judge Lasker premised this holding on 20 U.S.C. § 1099b(f), which provides in pertinent part:

Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association approved by the Secretary ... and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in the appropriate United States district court.

We review the denial of a motion to remand de novo and place the burden of persuasion upon the party who insists that federal jurisdiction obtains. *See BIW Deceived v. Local S6,* 132 F.3d 824, 831 (1st Cir.1997).

We appear to be the first appellate court to address this seldom-used removal statute. The statutory language is straightforward and the provision's meaning clear: if a civil action brought by an institution of higher education involves a denial of accreditation, then federal jurisdiction exists. MSL, by self-characterization, is an institution of higher education, and the ABA's withholding of accreditation is the cynosure of its suit. Thus, to the extent that MSL alleges harms within the accreditation process—and such allegations permeate its complaint—section 1099b(f) applies.

■ The only colorable issue that MSL raises with regard to remand implicates the constitutionality of section 1099b(f). This, too, is a question of first impression. For a case properly to "aris[e] under" federal law, 28 U.S.C. § 1331, Congress must confer federal jurisdiction in the context of a broad statutory framework within an area susceptible to congressional regulation. In other words, the jurisdictional grant must be "simply one part of [a] comprehensive scheme." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 496, 103 S.Ct. 1962, 1972–73, 76 L.Ed.2d 81 (1983). MSL contends that section 1099b(f) fails this test and that Article III does not permit Congress to confer federal jurisdiction by means of such a freewheeling jurisdictional statute. *See, e.g., The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 452, 13 L.Ed. 1058 (1851); *Mossman v. Higginson,* 4 U.S. (4 Dall.) 12, 13, 1 L.Ed. 720 (1800) (per curiam).

The focus of our inquiry thus becomes whether section 1099b(f)'s grant of jurisdiction occurs within a sufficiently comprehensive regulatory scheme. We answer this question affirmatively. Accreditation serves an important national function because once an institution of higher education becomes accredited by the DOE or its designated accrediting agency, the institution becomes eligible for federal student loan monies. *See Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schs. & Colleges,* 44 F.3d 447, 449 (7th Cir.1994). The Higher Education Act and the DOE's implementing regulations spin a sophisticated regulatory web that governs the relationship between accrediting agencies and accreditation applicants. *See, e.g.,* 34 C.F.R. § 602.24, 602.28 (1996) (requiring that accrediting agencies apply consistent standards and give applicants due process). The grant of federal jurisdiction over matters involving accreditation is reasonably related to the efficient operation of that system. No more is exigible.

To summarize, section 1099b(f)'s grant of federal jurisdiction occurs within a broad statutory framework, properly the subject of congressional concern. Accordingly, the statute comports with Article III. Removal was altogether appropriate.

## VI. THE EIGHT INDIVIDUAL DEFENDANTS

■ When the district court applies the prima facie standard and grants a motion to

dismiss for want of *in personam* jurisdiction without conducting an evidentiary hearing to resolve disputed jurisdictional facts, the court of appeals reviews its ruling de novo. *See Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 147 (1st Cir.1995). The lower court's decision to dismiss MSL's action as to the Committee members—defendants Hasl, Moeser, Ryan, Schneider, Sowle, Walwer, and Yu—falls within this sphere. So does the order dismissing the action against the last of the Eight Individual Defendants, Henry Ramsey, Jr. (the chair of the Section). Withal, Ramsey's situation requires a more extended analysis.

The factual basis for MSL's jurisdictional initiative derives predominantly from three events that occurred in 1993. According to the complaint, Hasl, Moeser, Schneider, and Ramsey met in Boston on February 6. The quartet allegedly "used false statements and charges"—the nature of which is not disclosed—in order "to try to bring their plan of non-accreditation of MSL to fruition." A review of the parties' proffers reveals, however, that the only MSL-related business transacted at this meeting involved a decision to delay the site visit by one month. MSL next alludes to a Committee meeting that took place on June 23 in Brooklyn, New York. The Eight Individual Defendants all attended this session and participated in the denial of MSL's application for accreditation. The Eight Individual Defendants, save Ramsey, also attended a retreat that took place on Nantucket Island, in Massachusetts, from June 24–27. MSL asserts conclusorily that the Committee "finalized" the denial of its application during this period, but the record flatly contradicts this assertion: the retreat participants all maintain (to quote from typical language appearing in their several affidavits) that "[w]hile in Nantucket, the Committee did not take up any agenda item concerning MSL, as all matters concerning MSL had been concluded in Brooklyn, New York, on June 23, 1993." MSL proffers no clear evidence showing that these statements are inaccurate.

■ On a motion to dismiss for want of *in personam* jurisdiction, Fed.R.Civ.P. 12(b)(2), the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists. *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Rodriguez v. Fullerton Tires Corp.,* 115 F.3d 81, 83 (1st Cir.1997). In conducting the requisite analysis under the prima facie standard, we take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim. *See Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir.1994). We then add to the mix facts put forward by the defendants, to the extent that they are uncontradicted. *See, e.g., Topp v. CompAir Inc.,* 814 F.2d 830, 836–37 (1st Cir.1987). We caution that, despite the liberality of this approach, the law does not require us struthiously to "credit conclusory allegations or draw farfetched inferences." *Ticketmaster–N.Y.,* 26 F.3d at 203.

■ A district court may exercise authority over a defendant by virtue of either general or specific jurisdiction. *See Donatelli v. National Hockey League,* 893 F.2d 459, 462–63 (1st Cir.1990). General jurisdiction "exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir. 1992). MSL does not argue, and we find no facts to suggest, that any of the Eight Individual Defendants can be brought before a Massachusetts court on a general jurisdiction theory.

■ In the absence of general jurisdiction, a court's power depends upon the existence of specific jurisdiction. Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities. *See Donatelli,* 893 F.2d at 462. In this instance, MSL asserts specific jurisdiction under Mass. Gen. L. ch. 223A. § 3 (1992). MSL cites variously to section 3(a), which extends "personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising

from the person's ... transacting any business" in Massachusetts, and to section 3(c), which authorizes personal jurisdiction over a non-resident who causes "tortious injury" by an "act or omission in this Commonwealth."

We need not pause to consider the particulars of the Massachusetts long-arm statute. Even if that statute, correctly applied, would purport to grant jurisdiction over the Eight Individual Defendants—a matter of state law on which we take no view—MSL still would have to demonstrate that "the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994). In the personal jurisdiction context, we have characterized compliance with the Constitution as implicating "three distinct components, namely, relatedness, purposeful availment (sometimes called 'minimum contacts'), and reasonableness." *Foster–Miller*, 46 F.3d at 144. We analyze the situations of the Eight Individuals Defendants through this prism.

■■■ In order for the extension of personal jurisdiction to survive constitutional scrutiny, a claim must "arise out of, or be related to, the defendant's in-forum activities." *Ticketmaster–N.Y.*, 26 F.3d at 206. We have approached the relatedness inquiry with slightly different emphases when the plaintiff asserts a contract claim then when she asserts a tort claim: if a contract claim, our stereotypical inquiry tends to ask whether the defendant's forum-based activities are "instrumental in the formation of the contract," *Hahn v. Vermont Law Sch.*, 698 F.2d 48, 51 (1st Cir.1983); if a tort claim, we customarily look to whether the plaintiff has established "cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)." *United Elec., Radio & Mach. Workers*, 960 F.2d at 1089;

*see also Ticketmaster–N.Y.*, 26 F.3d at 207 (noting that the relatedness inquiry is intended in part to "ensure[ ] that the element of causation remains in the forefront of the due process investigation"). In respect to the Eight Individual Defendants, MSL presents only tort claims before us,[5] and thus our relatedness analysis thus focuses on causation. We find this element clearly lacking as regards the seven Committee members.

The only activities undertaken in Massachusetts by any of these seven persons that possibly could relate to MSL's state-law claims consists of the participation of three of them in the Boston meeting and the attendance of all seven at the Nantucket retreat. MSL's insinuations notwithstanding, the particularized facts that were before the district court show conclusively that both of these activities were benign: the Boston meeting dealt with MSL in a purely peripheral sense (doing no more than to delay the site visit to MSL's facility by one month),[6] and the retreat did not deal with MSL at all.

MSL also argues that two letters written to it by James White, an ABA consultant, are sufficient to extend personal jurisdiction over the Eight Individual Defendants. One of these communiques informed MSL of the Committee's decision not to grant MSL provisional approval; contemporaneous copies were sent by White to the seven Committee members. The other letter informed MSL of the Council's decision to reject its application for a variance pursuant to Standard 802 and to deny its accreditation appeal. Contemporaneous copies of this letter were sent to defendants Hasl, Moeser, and Ramsey.

These missives do not carry weight in the jurisdictional calculus vis-à-vis the Eight Individual Defendants. We cannot subscribe to a transitive view of minimum contacts, which would hold that a letter from A to B that reports on C's actions confers personal jurisdiction over C in B's home state based on

---

5. To be sure, MSL originally brought a breach of contract claim against the Eight Individual Defendants, but this claim was frivolous from cradle to grave. The law is settled in Massachusetts that, "[u]nless otherwise agreed, a person making or purporting to make a contract for a disclosed principal does not become a party to the contract." *Porshin v. Snider*, 349 Mass. 653, 212

N.E.2d 216, 217 (1965) (internal quotation marks and citation omitted).

6. MSL does not allege that this postponement constituted an actionable harm. For our part, we do not fathom how it plausibly can be said to give rise to MSL's state-law claims.

those actions. Without a more substantial nexus, the extension of such jurisdiction would violate due process, for the connection between C's actions in an extra-forum jurisdiction and B's home state is too attenuated to satisfy the relatedness requirement. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 417, 104 S.Ct. 1868, 1873–74, 80 L.Ed.2d 404 (1984). Nor do we think that the case for the application of such a novel rule is bolstered by the mere fact that A (acting, for aught that appears, on his own initiative) chooses to inform C of his communication with B by mailing her a copy of it.

Although MSL does not assert in so many words that the Committee's denial of accreditation at the Brooklyn meeting constitutes conduct directed into Massachusetts sufficient to bestow personal jurisdiction, it intimates as much. We therefore address this possibility. The transmission of facts or information into Massachusetts via telephone or mail would of course constitute evidence of a jurisdictional contact directed into the forum state, *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985), but we must determine whether the Committee's decision to deny accreditation—a decision that had effects in Massachusetts—qualifies as such a contact.

We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and have found in the negative. For example, in *Sawtelle v. Farrell,* 70 F.3d 1381 (1st Cir.1995), we recounted *Kowalski v. Doherty, Wallace, Pillsbury & Murphy,* 787 F.2d 7 (1st Cir.1986), and noted that in *Kowalski* "we rejected the plaintiff's contention that, because the 'effects' of the firm's negligence were felt in New Hampshire, the law firm had caused an injury there by conduct directed at that forum." *Sawtelle,* 70 F.3d at 1390. Just as the New Hampshire effects of Massachusetts negligence, without more, could not sustain an action in New Hampshire against the negligent actor, *see Kowalski,* 787 F.2d at 11, so too the Massachusetts effects of the Eight Individual Defendants' New York actions, without more, fail to sustain an action in a Massachusetts court. *Accord Sawtelle,* 70 F.3d at 1394 (holding that New Hampshire effects of non-forum negligence, without more, are insufficient to support personal jurisdiction).

■ Ramsey is in a slightly different position. Although what we have just discussed pertains to him—after all, he participated in both the Boston and Brooklyn meetings—it is not conclusive because the record reflects that, unlike his seven cohorts, he had other contacts which might suffice to clear the relatedness hurdle. Ramsey wrote a memorandum to White that memorialized a·conversation between Ramsey and MSL's Dean Velvel. Ramsey reported that during this conversation Velvel attempted to couple MSL's effort to obtain waivers under Standard 802 with MSL's plan to persuade the DOE to jettison the ABA as the national accrediting agency for law schools. The memorandum itself indicates that Ramsey sent a copy to Velvel, presumably at MSL, and the inclusion of Velvel's Andover telephone number indicates that Velvel was in Massachusetts when he and Ramsey spoke. Although the contents of this memorandum hardly flatter MSL, the memorandum constitutes some indication that Ramsey engaged in conduct that might bear upon the relatedness inquiry.

Because of our doubts about the outcome of the relatedness inquiry vis-à-vis Ramsey, we turn to the question of whether Ramsey's contacts with Massachusetts "represent a purposeful availment of the privilege of conducting activities in [Massachusetts], thereby invoking the benefits and protections of [its] laws and making the defendant's involuntary presence before [the Massachusetts] court foreseeable." *Pritzker,* 42 F.3d at 61 (internal quotation marks and citation omitted).

Even though the record suggests that Ramsey participated in a telephone call with Dean Velvel concerning MSL's accreditation while Velvel was in Massachusetts, it is uninformative as to who initiated the call. In either case, we believe that this solitary telephone conversation and the subsequent mailing of a copy of Ramsey's memorandum, even when combined with Ramsey's participation in the Boston meeting, are insufficient to establish purposeful availment. *See,*

*e.g., Aylward v. Fleet Bank,* 122 F.3d 616, 618 (8th Cir.1997) (holding that three telephone calls and one letter within a seven month period were insufficient to support the exercise of personal jurisdiction when the alleged injury did not arise directly from the contacts); *U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.,* 894 F.2d 9, 11 (1st Cir.1990) (holding that three letters sent to Puerto Rico were insufficient to support the exercise of personal jurisdiction in that venue). Put another way, based on these exiguous contacts Ramsey could not reasonably have foreseen being haled into a Massachusetts court to answer allegations of a wide-ranging conspiracy. We therefore conclude that the extension of personal jurisdiction to him would violate his due process rights.

In a last-ditch effort to stem the tide, MSL laments that it did not have the opportunity to engage in jurisdictional discovery. The docket contains no evidence, however, that MSL ever made a motion or other documented request for jurisdictional discovery in the district court.[7] Therefore, in accordance with firmly settled principles, we will not entertain its plaint now. *See Sunview Condo. Ass'n v. Flexel Int'l, Ltd.,* 116 F.3d 962, 964–65 (1st Cir.1997).

We have said enough on this score. Because MSL neither alleged nor proffered sufficient facts to permit the exercise of jurisdiction over the Eight Individual Defendants, the district court did not err when it granted their motion to dismiss. *See* Fed.R.Civ.P. 12(b)(2).

## VII. THE ABA AND THE AALS

The ABA and the AALS each present multiple grounds in support of the district court's grant of summary judgment. The most striking of these is the defense of res judicata. In its present iteration, this defense turns on whether the judgment entered in the previous litigation between the parties (*MSL I* ) bars the plaintiff from maintaining the instant action against these two institutional defendants.[8]

Where, as here, both the potentially precluding suit and the potentially precluded suit were litigated in federal courts, federal law governs the res judicata effect of the prior judgment. *See Gonzalez v. Banco Central Corp.,* 27 F.3d 751, 755 (1st Cir. 1994). The elements of federal res judicata are "(1) a final judgment on the merits in an earlier suit, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two suits." *Id.* In this instance, the first and third tines of the test are foregone conclusions. Because the Supreme Court denied certiorari after the Third Circuit affirmed the district court's entry of final judgment in *MSL I,* the finality of the earlier judgment cannot be gainsaid. By like token, MSL, the ABA, and the AALS were parties to the precursor litigation and thus satisfy the identicality requirement. The question, then, is whether the state-law claims that MSL now advances against the ABA and the AALS are sufficiently related to the causes of action asserted in *MSL I* to warrant claim preclusion.

7. MSL's belated Rule 56(f) motion, *see infra* Part X, did not mention jurisdictional discovery.

8. The res judicata defense also might be available to some or all of the fourteen individual defendants. In its classic formulation, res judicata operates not only between parties, but between parties and their privies, *see, e.g., Fiumara v. Fireman's Fund Ins. Cos.,* 746 F.2d 87, 92 (1st Cir.1984), and the actions attributed to the individual defendants apparently occurred in their capacities as representatives of the ABA. The situation is tenebrous, however, because most of these defendants (all except Moeser and Yu, to be exact) successfully escaped from the Pennsylvania proceedings on jurisdictional grounds, *see MSL v. ABA,* 846 F.Supp. 374 (E.D.Pa.1994),

thus complicating their current effort to find shelter under the Pennsylvania court's judgment. *See generally Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 126 F.3d 365, 370 (2d Cir.1997) (suggesting, on somewhat dissimilar facts, that "[e]ven where a second action arises from some of the same factual circumstances that gave rise to a prior action, *res judicata* is inapplicable if formal jurisdictional or statutory barriers precluded the plaintiff from asserting its claims in the first action"), *cert. denied,* —— U.S. ——, 118 S.Ct. 1676, 140 L.Ed.2d 814 (1998). We do not need to resolve this thorny question because all the individual defendants reach safe harbor on other, more pedestrian theories. *See supra* Part VI; *infra* Part IX.

We begin with bedrock. To bring claim preclusion into play, a cause of action need not be a clone of the earlier cause of action. "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980). We have adopted a transactional approach to determine whether causes of action are sufficiently related to support a res judicata defense. *See Kale v. Combined Ins. Co.*, 924 F.2d 1161, 1166 (1st Cir.1991). "Under this approach, a cause of action is defined as a set of facts which can be characterized as a single transaction or series of related transactions." *Apparel Art Int'l, Inc. v. Amertex Enters., Ltd.*, 48 F.3d 576, 583 (1st Cir.1995). This boils down to whether the causes of action arise out of a common nucleus of operative facts. *See Gonzalez*, 27 F.3d at 755. In mounting this inquiry, we routinely ask "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations." *Aunyx Corp. v. Canon U.S.A., Inc.*, 978 F.2d 3, 6 (1st Cir.1992) (quoting Restatement (Second) of Judgments § 24 (1982)).

These principles are dispositive here. MSL's pending claims, though rooted in Massachusetts law, plainly arise from the same set of operative facts as its earlier antitrust claims. Although MSL describes the later claims more colloquially and dresses them in different legal raiment, the conduct that underbraces the two sets of claims is strikingly similar in time, space, origin, and motivation. Both suits stem from MSL's failed efforts in 1992 and 1993 to receive ABA accreditation. In both cases, MSL alleges that the ABA and the AALS orchestrated a long-term scheme to accumulate power and money and a short-term scheme to deny accreditation unjustly to MSL because MSL dared to oppose their hegemony.

In addition to their common heritage, the two suits also are compatible in a practical sense. It is settled "that where the witnesses or proof needed in the second action overlap substantially with those used in the first action, the second action should ordinarily be precluded." *Porn v. National Grange Mut. Ins. Co.*, 93 F.3d 31, 36 (1st Cir.1996). Because neither MSL's antitrust claims nor its state-law claims survived summary disposition, we must make an informed prophecy as to what witnesses would have appeared and what proof would have emerged had the two cases been tried. Here, the two suits' factual underpinnings are the same. This unmistakable congruence strongly suggests that the same witnesses—largely ABA, AALS, and MSL personnel—and information—the evolution of the ABA accreditation procedures and the details of the MSL accreditation effort—would have been necessary to resolve both cases. This substantial imbrication makes it apparent that the two cases would have formed a convenient trial unit and argues powerfully for claim preclusion. *See id.* at 34; *see also King v. Union Oil Co.*, 117 F.3d 443, 445 (10th Cir.1997).

To the extent that reasonable expectations, objectively assayed, enter into the res judicata calculus, they augur here toward the same conclusion. In the first place, since the two sets of claims arise in the same time frame out of similar facts, "one would reasonably expect them to be brought together," *Porn*, 93 F.3d at 37. In the second place, a party may be more readily presumed to expect that a court will treat multiple causes of action as a single trial unit when the plaintiff has all the facts necessary to bring the second claim at its disposal before or during the pendency of the first. MSL does not identify any significant facts that were not within its ken before the antitrust action reached its climax. We therefore conclude that the application of res judicata is an entirely predictable consequence of MSL's unilateral decision to split its claim.

Of course, res judicata will not attach if the claim asserted in the second suit could not have been asserted in the first. *See In re Newport Harbor Assocs.*, 589 F.2d 20, 24 (1st Cir.1978). In an effort to avoid looming defeat, MSL tries to squeeze through this loophole by questioning whether it could have brought the instant claims in

the Eastern District of Pennsylvania. Insofar as this question relates to MSL's pursuit of the ABA and the AALS, it is easily answered.

Under 28 U.S.C. § 1367(a), a federal court that exercises federal question jurisdiction over a claim may also assert supplemental jurisdiction over all state-law claims that arise from the same operative facts. *See BIW Deceived,* 132 F.3d at 833; *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1175 (1st Cir.1995). As we already have determined, the facts upon which MSL grounded its antitrust action concern MSL's efforts to receive ABA accreditation between 1992 and 1993. This same trove of facts also provides the basis for MSL's state-law claims against the ABA and the AALS. As a result, had MSL ventured to bring its current compendium of claims before the Pennsylvania federal district court as part and parcel of *MSL I,* that court could have entertained them in conjunction with the antitrust action then before it. *See* 28 U.S.C. § 1367.

█ Despite the fact that the Court has ceded the federal judiciary broad leeway to "look to the common law or to the policies supporting res judicata ... in assessing the preclusive effect of decisions of other federal courts," *Allen,* 449 U.S. at 96, 101 S.Ct. at 415, MSL makes one last effort to undercut the district court's determination. Res judicata cannot be applied against a plaintiff unless the plaintiff had a full and fair opportunity to litigate all its claims in the original action. *See id.* at 90, 101 S.Ct. at 412–13; *Kale,* 924 F.2d at 1168. Citing a series of adverse discovery rulings, MSL argues that it did not receive such an opportunity in the Eastern District of Pennsylvania.

█ The Court has not yet addressed the standard for determining the existence *vel non* of a full and fair opportunity in regard to a prior federal judgment. The standard, however, is quite permissive as it pertains to prior state court judgments. To meet this standard, a state court judgment need only "satisfy the minimal procedural requirements of the Fourteenth Amendment's Due Process

Clause." *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 481, 102 S.Ct. 1883, 1897, 72 L.Ed.2d 262 (1982). We do not envision a significantly less latitudinarian test for federal court judgments. We hold, therefore, that as long as a prior federal court judgment is procured in a manner that satisfies due process concerns, the requisite "full and fair opportunity" existed.

Here, MSL points to its numerous failed efforts to obtain additional discovery in the Eastern District of Pennsylvania and asseverates that draconian restrictions deprived it of an adequate chance to litigate its claims in *MSL I.* These allegations of discovery error are reheated for our consumption. They previously were reviewed and rejected by the Third Circuit, *see MSL I,* 107 F.3d at 1033–34, and we see no reason to revisit that determination.

At any rate, a full and fair opportunity to litigate cannot be equated with a license to do as a party pleases. The adjudicative process operates pursuant to rules, and an opportunity to litigate is no less "full" or "fair" simply because the forum court enforces conventional limitations on pretrial discovery. By any conceivable criterion, MSL had its full and fair opportunity to assert, in the Pennsylvania proceeding, the panoply of procedural and substantive rights guaranteed it by federal law. Its first action therefore furnishes a proper predicate for the application of res judicata in its second action.

In this instance, all roads lead to Rome. MSL had an appropriate opportunity to litigate its first set of claims, and conveniently could have brought the second set as part of the same proceeding. Its failure to do so dooms the instant action since MSL's two sets of allegations arise from a common nucleus of operative facts and fit together tongue and groove. We conclude that, as a consequence of this road not taken, res judicata precludes MSL's state-law claims against the ABA and the AALS. Accordingly, we affirm the district court's grant of summary judgment in favor of these two institutional defendants.[9]

9. Given this disposition, we do not address the other reasons that the ABA and the AALS tout as independently sufficient to support the entry of judgment in their favor.

## VIII. NEW ENGLAND SCHOOL OF LAW

 The district court granted NESL's motion to dismiss, ruling that the complaint failed to state a claim against NESL upon which relief could be granted. *See* Fed. R.Civ.P. 12(b)(6). We review this determination de novo, accept all well-pleaded facts as true, and draw all reasonable inferences in favor of the plaintiff. *See Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989). Notwithstanding the generous contours of this standard, a reviewing court need not "swallow plaintiff's invective hook, line, and sinker; bald assertions unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited." *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir. 1996).

MSL's briefing reads as if it were seeking to hold NESL liable for civil conspiracy. Nevertheless, its complaint aims the conspiracy charge elsewhere and the sufficiency of a complaint ordinarily should be tested by examining the claims that are stated therein rather than by weighing afterthought claims that are only mentioned in a legal brief. *See Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 22 (1st Cir.1998); *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 190 (1st Cir.1996); *Litton Indus., Inc. v. Colon,* 587 F.2d 70, 74 (1st Cir.1978). As MSL's complaint does not level a conspiracy charge against NESL, we limit our inquiry to the claims that MSL saw fit to plead.

MSL's complaint asserts two causes of action against NESL: tortious misrepresentation and violations of the Massachusetts statute governing unfair and deceptive trade practices (commonly known as Chapter 93A). The complaint predicates these causes of action on an exchange of correspondence between NESL officials (specifically, James Lawton, the chair of NESL's board of trustees, and Ellen Wayne, NESL's placement director) and the ABA's consultant, James White. We catalog these four pieces of correspondence.

Lawton wrote to White on January 2, 1990, stating in pertinent part:

The chairman of the Massachusetts Board of Regents is former U.S. Senator Paul Tsongas and he is for all intents and purposes the "principal" in the Massachusetts School of Law at Andover. Mr. Tsongas has the solid support of the *Boston Globe* and the Board of Regents are under his complete control at this time.

My guess is that any other, new or competing law schools, which may come into existence will not receive support from the Regents who are a rigidly controlled group of Dukakis loyalists who will only do what they are told by the present administration under Tsongas and [Governor] Dukakis.

Later that year, Wayne informed White that Massachusetts authorities had authorized MSL to award J.D. degrees, and that its graduates henceforth could sit for the Massachusetts bar. This missive, dated June 19, 1990, also mentioned that MSL had requested and received a table at a fair sponsored by the Northeast Association of Pre-Law Advisors (NAPLA). Wayne reported that NAPLA's by-laws had compelled approval of MSL's request, but that the NAPLA board of directors would amend the by-laws to restrict participation in subsequent programs to "ABA approved law school[s]." The complaint does not allege that NAPLA excluded MSL from any subsequent events.

Eight days later, White wrote to Lawton and solicited his opinion as to the possibility of convincing the Massachusetts Supreme Judicial Court (SJC) to amend its rules and require graduation from an ABA-accredited law school as a prerequisite to taking the Massachusetts bar examination. Lawton's response, dated July 17, 1990, indicated his approbation and recommended that members of the bar petition for such an amendment. The complaint does not allege that such a request was ever made or that the SJC revised its rules in the desired manner.[10]

The first letter from Lawton to White is plainly inaccurate insofar as it proclaims a Tsongas/MSL connection. Senator Tsongas, who had ties to a different unaccredited law

---

10. We take judicial notice that the SJC has not amended its rules to exclude MSL graduates

from sitting for the Massachusetts bar. *See* SJC Rule 3:01, § 2 (1997).

school, had none with MSL. MSL does not assert that the first letter contains any other inaccuracies and does not point to any misstatements in the remaining three epistles.

■ Against this mise-en-scéne, we turn to MSL's claim of tortious misrepresentation. This strikes us as something of a misnomer (our canvass of Massachusetts case law does not reveal a single articulation of the elements of a particularized cause of action for tortious misrepresentation), but in all events, Massachusetts jurisprudence recognizes causes of action for both fraudulent misrepresentation and negligent misrepresentation. *See, e.g., Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 222 N.E.2d 752, 753 (1967) (fraudulent misrepresentation); *Nycal Corp. v. KPMG Peat Marwick*, 426 Mass. 491, 688 N.E.2d 1368, 1371 (1998) (negligent misrepresentation). MSL's complaint does not plead this claim with sufficient particularity to support a charge of fraud,[11] *see* Fed. R.Civ.P. 9(b), and thus, we interpret the complaint as an attempt to articulate a claim for negligent misrepresentation. The elements of such a cause of action are that the defendant falsely represented a past or existing material fact without any reasonable basis for thinking it to be true; that he intended to euchre the plaintiff into relying on the representation; that the plaintiff, unaware of the representation's falsity, justifiably relied on it; and that the plaintiff suffered harm due to his reliance. *See* 37 Am.Jur.2d, *Fraud and Deceit* § 12 (1968).

■ The claim deserves short shrift. To be sure, the comments about Senator Tsongas amount to a misrepresentation, but MSL does not plead that it relied on that misrepresentation to its detriment,[12] and such reliance cannot plausibly be inferred from the complaint's other averments. The general rule is that, without this necessary element, there can be no recovery for negligent misrepresentation under Massachusetts law.

*See Romanoff v. Balcom*, 4 Mass.App.Ct. 768, 339 N.E.2d 927, 927 (1976).

■ There is an exception to this rule. In the absence of detrimental reliance, a party still may be held liable under Massachusetts law for misrepresentation of information negligently supplied for the guidance of others. *See Fox v. F & J Gattozzi Corp.*, 41 Mass.App.Ct. 581, 672 N.E.2d 547, 551 (1996) (stating that if a defendant "in the course of his business . . . supplies false information for the guidance of others in their business transactions," he "is subject to liability for pecuniary loss caused to [third persons] by [the recipient's] justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information") (quoting Restatement (Second) Torts § 552(1) (1977)).

MSL's claim for tortious misrepresentation fails to qualify for this exception. Even if we assume that Lawton's first letter to White occurred in the course of a "business transaction"—a fact that MSL does not allege—MSL pleads neither that it (or anyone else, for that matter) relied upon Lawton's *faux pas* nor that it suffered any harm as a result of the transmittal of the Tsongas-related (mis)information. Hence, the district court did not err in granting NESL's motion to dismiss the tortious misrepresentation count.

■ We next engage MSL's Chapter 93A claim for "unfair and deceptive acts." Mass. Gen. Laws ch. 93A, § 2. By their nature, Chapter 93A claims tend to be case-specific. Their general meter, however, is that the defendant's conduct must be not only wrong, but also egregiously wrong—and this standard calls for determinations of egregiousness well beyond what is required for most common law claims. *See Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 390 N.E.2d 243, 251 (1979). To quote a by-now-familiar formulation, "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and

---

11. The complaint does contain a separate count for fraud and deceit, but that count does not name NESL as a defendant.

12. This omission is scarcely an oversight. In MSL's claim for fraud and deceit against the ABA and various individual defendants, it explic-

itly claims to have relied upon representations made by those parties. In formulating its misrepresentation claim against NESL, however, MSL makes no comparable assertion. The contrast is telling.

tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979).

MSL's complaint is inscrutable as to the precise nature of its Chapter 93A claim and its briefing is not very helpful on this score. Its complaint attributes nothing to NESL beyond the latter's role in the exchange of correspondence described above. MSL apparently means to asseverate that publication of the statements contained in the exchange of correspondence defamed or otherwise damaged it and thus transgressed Chapter 93A. This asseveration cannot survive scrutiny.

■ The SJC recently has held that "where allegedly defamatory statements do not support a cause of action for defamation, they also do not support a cause of action under [Chapter] 93A." *Dulgarian v. Stone,* 420 Mass. 843, 652 N.E.2d 603, 609 (1995). Truth is an absolute defense to a defamation action under Massachusetts law, *see Bander v. Metropolitan Life Ins. Co.,* 313 Mass. 337, 47 N.E.2d 595, 598 (1943), and MSL therefore must demonstrate that NESL published "a false and defamatory written communication of and concerning the plaintiff." *McAvoy v. Shufrin,* 401 Mass. 593, 518 N.E.2d 513, 517 (1988). As previously noted, the only false statement ascribed to any NESL representative concerns Senator Tsongas's alleged patronage of MSL.

■ We next consider if that statement can form the basis for a claim of defamation *by MSL.* Whether a statement is reasonably susceptible of a defamatory meaning is a question of law for the court. *See Foley v. Lowell.Sun Pub. Co.,* 404 Mass. 9, 533 N.E.2d 196, 197 (1989). For a communication to qualify as defamatory, "[t]he test is, whether, in the circumstances, the writing discredits the plaintiff in the minds of any considerable and respectable class in the community." *Smith v. Suburban Restaurants, Inc.,* 374 Mass. 528, 373 N.E.2d 215, 217 (1978). The core question, therefore, is not whether Lawton's demonstrated falsehood discredits *somebody*—it plainly denigrates the late senator—but whether it significantly discredits MSL. *See New Eng. Tractor–Trailer Training, Inc. v. Globe*

*Newspaper Co.,* 395 Mass. 471, 480 N.E.2d 1005, 1007 (1985).

In our estimation, the misstatement contained in Lawton's January 2 letter does not sink to this level. The senator enjoyed an enviable reputation as a public servant of the highest integrity. MSL has failed utterly to suggest how any educational institution could be defamed by attributing to it a connection with him. Absent such a link, no action lies. *See, e.g., Schwanbeck v. Federal–Mogul Corp.,* 31 Mass.App.Ct. 390, 578 N.E.2d 789, 804 (1991) (explaining that false statements must have adverse consequences for a plaintiff in order to be actionable under Chapter 93A). Thus, the Tsongas-related comment, though untrue, is not defamatory *of and concerning MSL.*

Nor does MSL's complaint allege any other cognizable basis for Chapter 93A liability on NESL's part. The four items of correspondence hint that NESL did not wish MSL well, but none of the matters which its representatives discussed with White suggest activities so scurrilous as to trigger liability under Chapter 93A. Although we understand that a Chapter 93A violation need not rest on an independent common law tort, *see Massachusetts Farm Bureau Fed'n, Inc. v. Blue Cross, Inc.,* 403 Mass. 722, 532 N.E.2d 660, 664 (1989), the conduct must at least come within shouting distance of some established concept of unfairness. *See Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515–16 (1st Cir. 1988).

To sum up, even if Lawton and Wayne, on NESL's behalf, participated in activities of the kind adumbrated by their correspondence, such activities, though hostile to MSL and inimical to its interests, are not "so seriously deceptive and harmful" as to permit recovery under Chapter 93A. *Zayre Corp. v. Computer Sys. of Am., Inc.,* 24 Mass.App.Ct. 559, 511 N.E.2d 23, 30 n. 23 (1987). Indeed, NESL's suspected (but unproven and unalleged) "actions"—e.g., asking NAPLA to amend its by-laws or petitioning the SJC to revise its rules—do not abridge any legal duty or bedrock concept of unfairness, and are not so "unethical, oppressive, or unscrupulous" as to be actionable under Chapter

93A. *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975) (citation and internal quotation marks omitted). What is more, MSL fails to allege how NESL's involvement in these activities actually caused any cognizable economic harm to it. In itself, this is a fatal flaw. *See Zayre Corp.*, 511 N.E.2d at 30; *see also* Mass. Gen. Laws ch. 93A, § 11 (explaining that, in a Chapter 93A claim, the complainant must show that she "suffer[ed] a loss of money or property, real or personal, as a result of the use . . . of an unfair method of competition or an unfair or deceptive act or practice").

That ends the matter. Because MSL has not advanced any sound basis on which NESL could be held liable either for negligent misrepresentation or for transgressing Chapter 93A, we uphold Judge Lasker's order granting NESL's motion to dismiss.

## IX. THE SIX INDIVIDUAL DEFENDANTS

We need not linger long over MSL's claims against the Six Individual Defendants.[13] This sextet comprises the ABA's consultant (White), plus the five members of the site-visit team (Garcia–Pedrosa, Nahstoll, Smith, Strickland, and Winograd). Judge Lasker dismissed MSL's breach of contract claim against these persons under Rule 12(b)(6) and entered summary judgment in their favor on MSL's remaining claims.

Our review is swift because "[w]e have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation." *United States v. Bongiorno*, 106 F.3d 1027, 1034 (1st Cir.1997). An issue lacks developed argumentation if the appellant merely mentions it as "a possible argument in the most skeletal way, leaving the court to do counsel's work." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990).

This is such a case. MSL's brief focuses mainly on the ABA and does not make any real attempt to construct a reasoned argument that would call into legitimate question the district court's rulings with regard to the Six Individual Defendants. Of course, with a record appendix that boasts more than 6,500 pages, MSL has furnished a welter of paper, but it has not arrayed these plethoric evidentiary materials in any systematic way vis-à-vis these defendants. Instead, MSL strives to bind together several mounds of proof, quasi-proof, and unsubstantiated allegations together with desultory rhetoric. More is required to pass muster under *Bongiorno* and *Zannino*. Accordingly, MSL has forfeited any objection to the lower court's entry of judgment in favor of the Six Individual Defendants.

## X. THE RULE 56(f) MOTION

Fed.R.Civ.P. 56(f) provides:

Should it appear from the affidavits of a party opposing [a motion for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

MSL contends that the district court erroneously denied its motion for further discovery under Rule 56(f). This contention lacks force.

We first set the stage. The ABA and the Six Individual Defendants moved for dismissal on March 29, 1996. The AALS filed a motion for summary judgment on the same date. MSL opposed both motions and the court heard oral arguments on June 7. Three weeks later, while the district court still had the motions under advisement, MSL moved to defer their adjudication until it had obtained more discovery. After conferring with all counsel, the district court denied the Rule 56(f) motion on August 28. On September 26, 1996, the AALS filed a supplemental motion for summary judgment. Four days later, the ABA and the Six Individual Defendants filed a joint motion for summary judgment. MSL again filed oppositions, but did not renew its Rule 56(f) motion. The district

---

13. Five of these defendants participated in the site visit to MSL's facility. In all events, none of them contested the district court's exercise of *in personam* jurisdiction.

court granted the AALS's motion for *brevis* disposition on March 3, 1997, and granted the parallel motion brought on behalf of the ABA and the Six Individual Defendants on May 8, 1997.

In this venue, MSL ardently embraces Rule 56(f). It contends that the district court acted improvidently in refusing the requested continuance and proceeding to rule upon the defendants' dispositive motions.

■ To savor the balm of Rule 56(f), a party must act in a timely fashion. *See Resolution Trust Corp. v. North Bridge Assocs., Inc.*, 22 F.3d 1198, 1204 (1st Cir.1994). Moreover, the moving papers must contain a proffer which, at a bare minimum, articulates a plausible basis for the movant's belief that previously undisclosed or undocumented facts exist, that those facts can be secured by further discovery, and that, if obtained, there is some credible prospect that the new evidence will create a trialworthy issue. *See Mattoon v. City of Pittsfield*, 980 F.2d 1, 7–8 (1st Cir.1992); *Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 988 (1st Cir.1988). Finally, the motion must set forth good cause to explain the movant's failure to have conducted the desired discovery at an earlier date. *See Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 584 (1st Cir.1994); *Resolution Trust*, 22 F.3d at 1205.

■ We review the denial of relief under Rule 56(f) for abuse of discretion. *See Sheinkopf v. Stone*, 927 F.2d 1259, 1263 (1st Cir.1991). We discern no abuse here. To the contrary, the record reveals that MSL's attempt to invoke Rule 56(f) was both too late and too little.

■ We deal first with the temporal aspect. It is firmly established that a Rule 56(f) motion must be made within a reasonable time following the receipt of a motion for summary judgment. *See Resolution Trust*, 22 F.3d at 1204. This means that a Rule 56(f) motion normally should precede or accompany the response to the summary judgment motion or follow as soon as practicable thereafter. *See Paterson–Leitch*, 840 F.2d at 988. Of course, there may be extenuating circumstances under which "a party opposing a dispositive motion may not realize until the initial round of oral argument that he requires additional discovery time." *Id.* But this is an outer limit, and a Rule 56(f) extension request made after the conclusion of oral argument on a summary judgment motion ordinarily comes too late. *See C.B. Trucking, Inc. v. Waste Mgmt., Inc.*, 137 F.3d 41, 44 n. 2 (1st Cir.1998) ; *Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 520 (9th Cir. 1990); *Dowling v. City of Philadelphia*, 855 F.2d 136, 140 (3d Cir.1988); *Pfeil v. Rogers*, 757 F.2d 850, 856–57 (7th Cir.1985).

Measured against these temporal benchmarks, MSL's motion—which was not made until three weeks after oral argument on the defendants' initial set of dispositive motions—was out of time.[14] Nor do sufficiently excusatory circumstances exist. At the time it instituted this action, MSL had been at war with the ABA and the AALS for roughly two years. It had received amplitudinous discovery in the antitrust case and knew—or should have known—immediately upon receipt of the defendants' dispositive motions whether it needed more information to oppose them. There is no readily apparent reason why MSL procrastinated in deploying Rule 56(f), and MSL fails to offer any persuasive explanation for the delay.

Although we could affirm the district court's denial of Rule 56(f) relief on this basis alone, the ruling also rests on solid substantive grounds. The plaintiff accompanied its motion with an affidavit, executed by Dean Velvel, that described the facts it hoped to unearth through further discovery. By and large, these facts pertain to the existence and operation of the ostensible conspiracy between the ABA and the AALS. But MSL did not suggest below, and does not suggest here, how these new materials would palliate the force of the ABA's and the AALS's res judicata defense.[15]

---

**14.** To be sure, the defendants filed supplemental motions at a later date, but MSL takes nothing from that circumstance because it did not renew its Rule 56(f) initiative in respect to those supplementations.

**15.** Indeed, the institutional defendants did not advance the res judicata defense until a final

That omission undermines MSL's position. Whatever other issues originally may have lurked in the penumbra of the defendants' motions, the stark reality is that MSL's action founders because it could have raised its state-law claims in *MSL I*, but did not do so. No additional discovery can alter that reality. Thus, the short answer to MSL's protest about truncated discovery is that, as against the ABA and the AALS, the district court's refusal to grant a Rule 56(f) continuance was harmless.

Substantively speaking, there is yet another obstacle blocking MSL's path. A party relying on Rule 56(f) must demonstrate that he exercised due diligence in pursuing discovery. *See C.B. Trucking,* 137 F.3d at 45; *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 92 (1st Cir.1996). The district court denied MSL's motion to remand on January 18, 1996. Insofar as we can tell, MSL thereafter failed to take steps reasonably available to it to secure discovery. We explain briefly.

The District of Massachusetts operates under an "automatic discovery" paradigm. *See* Fed.R.Civ.P. 26(a)(1); D. Mass. Loc. R. 26.2 (1996). The court's local rules provide that unless otherwise ordered by a judicial officer, a "party must provide to other parties disclosure of the information and materials called for by [the automatic discovery rule]" before that party can initiate further discovery. D. Mass. Loc. R. 26.2(A). The record contains no evidence that MSL complied with its automatic discovery responsibilities, that it attempted to initiate any discovery, or that it sought permission from a judicial officer to do so. What is more, Judge Lasker issued a scheduling order on February 28, 1996, in which he admonished all counsel that, if dis-covery could not be effectuated consensually, "motions to compel discovery may be filed in accordance with the provisions of Local Rule 26.2(C)." MSL never filed any such motion.[16]

We will not paint the lily. Rule 56(f) is designed to "minister[ ] to the vigilant, not to those who slumber upon perceptible rights." *Paterson–Leitch,* 840 F.2d at 989 n. 5 (internal quotation marks and citation omitted). Given its lethargic approach to discovery, MSL cannot now be heard to complain about the district court's refusal to stay proceedings on the summary judgment motions. *See Mattoon,* 980 F.2d at 8; *Hebert v. Wicklund,* 744 F.2d 218, 222 (1st Cir.1984).

To this point, we have focused on the ABA and the AALS. Nonetheless, the upshot is the same across the board. With regard to the fourteen individual defendants, the affidavit that accompanied the Rule 56(f) motion mentions only one—Steven Smith—and only mentions him in the most inconsequential manner. The affidavit does not refer to NESL. Therefore, the record does not sustain a claim that discoverable materials actually existed that would have raised a trialworthy issue as to any of these fifteen defendants.

## XI. CONCLUSION

We need go no further. MSL adduces other arguments, but none of them requires elaboration. It suffices to say that David does not always best Goliath.

*Affirmed.*

---

judgment had been entered in *MSL I* (which occurred after the district court had denied MSL's Rule 56(f) motion in this case). If MSL genuinely believed that further discovery would be utile *on this issue,* it should have renewed its Rule 56(f) motion. As previously noted, it did not do so.

**16.** The Record Appendix contains an April 18, 1996 letter from MSL's counsel to the district judge which "requests that the Court order the immediate production of discovery MSL has sought on its state law claims." This letter does not appear in the docket, and cannot be con-strued as a motion. *See Weinberger v. Great N. Nekoosa Corp.,* 925 F.2d 518, 528 (1st Cir.1991); *Hebert v. Wicklund,* 744 F.2d 218, 221 n. 3 (1st Cir.1984). Even were the letter to be so construed, it would fail to satisfy Local Rule 26.2(C) (warning that the court will "not consider any discovery motion that is not accompanied by a certification, as required by [other local rules], that the moving party has made a reasonable good-faith effort to reach agreement with opposing counsel on the matters set forth in the motion").