# United States Court of Appeals
## For the First Circuit

No. 00-1222

IN RE: PETER P. IANNOCHINO, PAULA M. IANNOCHINO

Debtors

_____

PETER P. IANNOCHINO, et al.,

Plaintiffs, Appellants,

v.

STEPHAN M. RODOLAKIS; CARL D. AFRAME,

Defendants, Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

_____

Before

Torruella, Chief Judge,
Stahl and Lipez, Circuit Judges.

_____

Thomas W. Duffey with whom James P. Keane and Keane & Klein were on brief for appellant.
Stephen J. Duggan with whom Lynch & Lynch were on brief for appellee Stephan M. Rodolakis.
Neva Kaufman Rohan with whom John E. Garber and Robinson Donovan Madden & Barry were on brief for appellee Carl D. Aframe.

March 12, 2001

**LIPEZ, <u>Circuit Judge</u>**.    We decide here whether an award of fees in bankruptcy to a debtor's attorney will act as a bar under claim preclusion principles to a later suit filed by the debtor alleging professional malpractice arising from the bankruptcy representation. Peter and Paula Iannochino, the debtors in this action, filed a malpractice suit in the Massachusetts courts two years after their former attorneys, defendants Carl Aframe and Stephen Rodolakis, had received a fee award from the bankruptcy court.  After their complaint was removed to the bankruptcy court, the court granted the defendants' motions for summary judgment, reasoning that under the circumstances present here, the malpractice claims were barred by the principles of res judicata.  The Iannochinos appealed to the district court, which affirmed.  They continue their appeal here, arguing that res judicata is inapplicable because none of the requirements of that doctrine are present.  After having carefully considered their contentions, we affirm.

## I. Background

As this case comes before us following summary judgment, we summarize the relevant facts in the light most favorable to the non-movants, the Iannochinos.  In 1979, the Iannochinos began operation of a copy center on Main Street in Worcester, Massachusetts, as franchisees of Kwik Kopy.  Despite occasional disputes, the relationship was relatively stable through 1988.  Then, the Iannochinos

-3-

gradually fell behind on their obligations under the franchise agreement. By 1991, the past due amount had grown to $49,000, but the Iannochinos entered into an agreement with Kwik Kopy to resolve the issue.

During that same year, the Iannochinos began to expand their business by entering into a contract with Clark University to open a second copy center on the Clark campus. Although the written contract is silent on the issue, the Iannochinos claimed that Clark agreed to deal with them exclusively for all of its copying work, an arrangement the Iannochinos estimated would allow the Clark copy center to gross between $325,000 and $375,000 per year. In return, the Iannochinos obligated themselves to make various payments, either to Clark directly or to third parties on its behalf, for such things as royalties and rent. Shortly after the execution of the written contract with Clark, the Iannochinos executed a second franchise agreement with Kwik Kopy to cover the Clark copy center.

Business at this center was initially good, though gross revenues did not meet the Iannochinos' expectations. The Iannochinos blamed the poor revenues on Clark, concluding that it was not abiding by the exclusivity agreement and was instead using other providers for its copying services. By mid-1993, sales were so poor that the Iannochinos closed the Clark copy center. Shortly thereafter, Clark filed suit against the Iannochinos, alleging that the closure of the

-4-

store was a breach of contract.  The Iannochinos, acting through counsel,[1] answered the complaint and filed a counterclaim alleging that Clark breached the exclusivity agreement.

By this time, however, the Iannochinos' problems were not limited to the now closed Clark copy center.  Between June and September of 1993, the Iannochinos sought the advice of an accountant to assist them with other business problems that included cash flow difficulties at their Main Street store.  The accountant suggested that the Iannochinos consider filing for Chapter 13 bankruptcy protection.  In September, the Iannochinos first approached Rodolakis, ostensibly for legal advice regarding the Clark University lawsuit and counterclaim.  At that time, Rodolakis was a partner with Aframe in the law firm of Aframe & Rodolakis.  The Iannochinos retained Rodolakis as their attorney shortly after this first meeting, granting him a $6,000 security interest in their car to secure his services.

For the next three months, the Iannochinos' financial problems worsened.  Rodolakis advised the Iannochinos that they could unilaterally reject their franchise agreements with Kwik Kopy and begin operations under a new corporate name, Action Press, after removing all Kwik Kopy signs and materials from their Main Street store.  The

---

[1]     It appears from the record that neither Aframe nor Rodolakis entered an appearance at any time in the Clark University lawsuit, though, as discussed herein, Rodolakis did offer the Iannochinos legal advice connected with the suit and their counterclaim.

Iannochinos followed this advice, though it brought a quick response from Kwik Kopy, which informed the Iannochinos in December of 1993 that it believed the act of removing its name from the store and commencing operations under a new corporation was in violation of a non-compete clause in the franchise agreement. In the same letter, Kwik Kopy also terminated the franchise for insolvency.

It was in this context that Rodolakis advised the Iannochinos to file a Chapter 13 bankruptcy petition. Rodolakis informed the Iannochinos that they might be able to reject the franchise agreements--and in particular, the non-compete provisions of those contracts--on the basis that they were executory contracts. The Iannochinos agreed to file for bankruptcy, and in late December, after receiving Kwik Kopy's letter, they filed a Chapter 13 petition. In addition to their potential liability for breach of the non-compete provision, the Iannochinos also owed Kwik Kopy $79,383.82. Rodolakis did not, however, initiate negotiations with Kwik Kopy prior to filing for bankruptcy, either to settle this past due amount or otherwise attempt to resolve the problems between the Iannochinos and Kwik Kopy.

From the time of filing until April of 1994, the dispute between the Iannochinos and Kwik Kopy over the broken franchise agreement continued. Kwik Kopy sought to litigate the non-compete provision on several occasions, both in the state courts and in the bankruptcy court through adversary proceedings. These efforts were

interspersed with short-lived settlements. In April, the Iannochinos converted their case to a Chapter 7 proceeding. The dispute with Kwik Kopy was eventually resolved when the parties entered into an agreement allowing the Iannochinos to continue operation as Action Press despite the non-compete provision, provided that they gave a local Kwik Kopy center the right of first refusal for certain jobs.

Throughout this time, the Clark University lawsuit was continuing. The Iannochinos had originally been represented by another attorney in that matter, but that attorney withdrew and they turned to Rodolakis for advice about how to continue. Though Rodolakis refused to represent them in that action, he advised them not to take any action in their own defense. Instead, they were to ignore the lawsuit and their counterclaim and deal with an adverse judgment as with any other debt in bankruptcy. The Iannochinos had reservations about this advice. They continued to believe that they had a valid counterclaim that should have, at the least, prevented the entry of judgment against them. Nonetheless, the Iannochinos followed Rodolakis's advice and a default judgment was entered against them.

By November of 1994, the relationship between the Iannochinos and Rodolakis had deteriorated to the point that Rodolakis petitioned the bankruptcy court for permission to withdraw as the Iannochinos' counsel. This motion was granted on December 5th. In January, Aframe filed an administrative fee application for compensation for services

that the law firm of Aframe & Rodolakis had provided the Iannochinos.

The Iannochinos filed an opposition to this application, alleging,

among other things, that Aframe was not entitled to any fees because he

was not their attorney. Despite the breakdown of their relationship

and their unease about some of the advice Rodolakis had given them, the

Iannochinos never alleged that the services included within the

application had been of poor quality or had caused either them or the

estate harm.

In March, after a hearing that the Iannochinos did not

attend, the bankruptcy court allowed, in part, an award of fees to

Aframe. The amount awarded, $6,420.24 in fees and $571.73 in costs,

represented payment for services rendered prior to April 8, 1994, the

date of the conversion from Chapter 13 to Chapter 7. No fees or costs

for services performed after that date were allowed. Eventually, and

some time after this award of fees, the Iannochinos again retained

Rodolakis in connection with the ongoing bankruptcy.

Approximately two years later, the Iannochinos filed the

current action in Massachusetts state court. This action was removed

to the bankruptcy court in November of 1996. The Iannochinos'

complaint was grounded upon the legal services the defendants had

provided during the bankruptcy and alleged that, through those

services, Rodolakis and Aframe had committed professional malpractice

and had engaged in unfair trade practices in violation of Mass. Gen.

-8-

Laws ch. 93A.  The defendants moved for summary judgment in 1998.  The bankruptcy court granted the motion, holding that the Iannochinos' claims were barred by the res judicata effect of the 1994 order on the fee application.  The Iannochinos appealed this judgment to the district court, which affirmed.  Their appeal from the district court is now before us.


## III. Res Judicata

Federal res judicata principles govern the res judicata effect of a judgment entered in a prior federal suit, including judgments of the bankruptcy court.  See FDIC v. Shearson-American Express, Inc., 996 F.2d 493, 496 (1st Cir. 1993); In re El San Juan Corp., 841 F.2d 6, 9 (1st Cir. 1988).  "In an appeal from district court review of a bankruptcy court order, the court of appeals independently reviews the bankruptcy court's decision, applying the clearly erroneous standard to findings of fact and de novo review to conclusions of law."  In re SPM Manuf. Corp. (Official, Unsecured Creditors Committee v. Stern), 984 F.2d 1305, 1310-11 (1st Cir. 1993).  Our direct review of the bankruptcy court's judgment, as well as of the underlying question of whether res judicata applies to bar the malpractice claim, is de novo.  See Suarez v. Pueblo Int'l, Inc., 229

F.3d 49, 53 (1st Cir. 2000); Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 978 (1st Cir. 1995).

## A. The malpractice counterclaim

As an initial matter, we must address whether the doctrine of res judicata applies to this case. The Iannochinos argue that res judicata is inappropriate here because they "have never pursued a prior remedy or suit against the defendants [or] engaged in multiple attempts to obtain relief." Though this argument is strikingly undeveloped, it adverts to an important issue. At the time of the fee application, the Iannochinos' malpractice claims were counterclaims and/or defenses to that application. The failure to interpose a counterclaim does not necessarily act as a bar to later actions. See, e.g., Restatement (Second) of Judgments § 22(1) (1982); see also Rowland v. Harrison, 577 A.2d 51, 56 (Md. 1990) (refusing to find preclusion for failure to raise counterclaim under Maryland's permissive counterclaim rule). This principle protects putative counterclaimants from the inadvertent loss of their claim. Carried too far, however, this principle would undermine the protective purpose of res judicata. See, e.g., Bay State HMO Mgmt., Inc. v. Trigley Sys., Inc., 181 F.3d 174, 181 (1st Cir. 1999) ("The policy behind res judicata is to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.") (internal quotations omitted). Consequently, this

-10-

principle is subject to two important exceptions that narrow its applicability and reduce the potential waste of judicial resources and costs to the parties associated with multiple suits based upon the same facts.  See Restatement (Second) of Judgments § 22(2) (1982).

The first of these exceptions applies to compulsory counterclaims.  See id. § 22(2)(a).  But for the bankruptcy setting of this case, the Iannochinos' malpractice counterclaims would be subject to this exception.  A fee application in bankruptcy is akin to an action to recover a debt.  Under ordinary federal rules of civil procedure, if a counterclaim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction," the counterclaim is compulsory and must be raised. Fed. R. Civ. P. 13(a).  As both the fee application and the malpractice counterclaim concern the same transaction, the counterclaim would have been subject to Rule 13.  Moreover, the compulsory counterclaim rule is applicable in certain bankruptcy contexts.  Thus, if the fee application had changed from a contested matter to an adversary proceeding,[2] the Iannochinos' malpractice counterclaims would also have been compulsory and subject

---

[2]    Contested matters can become adversary proceedings when "an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001."  See Fed. R. Bankr. P. 3007.  Such relief includes demands for monetary damages. See Fed. R. Bankr. P. 7001(1).

to res judicata. See Fed. R. Bankr. P. 7013 (making Fed. R. Civ. P. 13 applicable to adversary proceedings). Alternatively, the bankruptcy court could have ordered Rule 7013 applicable to the fee application, again subjecting the counterclaims to res judicata under this exception. See Fed. R. Bankr. P. 9014 (allowing the bankruptcy court "at any stage in a particular [contested] matter [to] direct that one or more of the" rules applicable to adversary proceedings apply). Nothing in the record indicates, however, that the fee application ever became an adversary proceeding or that the bankruptcy court ever directed that Rule 7013 apply. Therefore, the Iannochinos' malpractice counterclaim to the fee application was not compulsory and cannot be res judicata under this exception.

The second exception is applicable when the "relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action." Restatement (Second) of Judgments § 22(2)(b) (1982). In the normal course of civil litigation, the Iannochinos' malpractice counterclaim could not affect a prior judgment assessing fees. See Rowland, 577 A.2d at 57 (holding claim for professional malpractice against veterinarian would not nullify prior judgment establishing debt for the allegedly substandard services). In bankruptcy, however, a successful malpractice action could impair rights that Aframe and Rodolakis had

-12-

gained from the order awarding them fees.  Under the relevant section

of the bankruptcy code governing fee awards, a finding of malpractice

would mean that the attorneys were not entitled to compensation for

those services found to be substandard.  See 11 U.S.C. § 330(a)(4)[3]; see

also In re Southmark, 163 F.3d 925, 931 (5th Cir. 1999) ("It is evident

that a court-appointed professional's dereliction of duty could

transgress both explicit Code responsibilities and applicable

professional malpractice standards.").  Nor does it matter that the

fees may already have been awarded by the time of the malpractice

judgment.  Fed. R. Civ. P. 59 and 60 are applicable in bankruptcy, thus

giving bankruptcy courts broad authority to reconsider judgments.  See

Fed. R. Bankr. P. 9023 (Fed. R. Civ. P. 59); Fed. R. Bankr. P. 9024

(Fed. R. Civ. P. 60); see also Fed. R. Bankr. P. 3008 (allowing parties

in interest to "move for reconsideration of an order allowing or

---

[3]     Section 330(a)(4) provides:
(A) Except as provided in subparagraph (B), the court shall
not allow compensation for–
        (i) unnecessary duplication of services; or
        (ii) services that were not–
            (I) reasonably likely to benefit the debtor's
            estate; or
            (II) necessary to the administration of the case.
(B) In a chapter 12 or chapter 13 case in which the debtor
is an individual, the court may allow reasonable
compensation to the debtor's attorney for representing the
interests of the debtor in connection with the bankruptcy
case based on a consideration of the benefit and necessity
of such services to the debtor and the other factors set
forth in this section.
11 U.S.C. § 330(a)(4).

-13-

disallowing a claim against the estate").  Furthermore, a bankruptcy court can order professionals to disgorge fees that it had previously awarded them.  See 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); In re Hot Tin Roof, Inc., 205 B.R. 1000 (1st Cir. Bankr. App. Panel 1997) (upholding disgorgement for failure to disclose conflict of interest); In re Capgro Leasing Assocs., 169 B.R. 305, 317 (E.D.N.Y. 1994) (ordering disgorgement of fees because services did not benefit the estate in any way).

The "successful prosecution" of the Iannochinos' malpractice claims in the action here has the potential, therefore, to provide the basis for a later order, following a motion to reconsider, forcing Aframe and Rodolakis to disgorge the fees that the bankruptcy court awarded them.  Thus, the second exception in section 22 of the Restatement is applicable here.  See Restatement (Second) of Judgments § 22 Rptr. Notes (1982) (noting that the exception is applicable where "a defendant, having failed to interpose a defense or counterclaim in a prior action which terminated in a judgment for plaintiff, now seeks in a subsequent action to obtain relief which, if granted, would permit recovery of the amount paid pursuant to that judgment on a restitution theory").  The Iannochinos cannot escape res judicata on the ground

that their malpractice claims were only counterclaims to the fee application.[4]

## B. The three requirements of res judicata

Having determined that res judicata is generally applicable in this situation, we next evaluate whether the specific res judicata requirements are present.  For the fee award to bar the Iannochinos' malpractice claim, there must be "(1) a final judgment on the merits in an earlier suit, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two suits."[5]  Mass. School of Law v. American Bar Assoc., 142 F.3d 26, 37 (1st Cir. 1998).  The Iannochinos contend that each of these requirements is absent.[6]

---

[4]    We note that even if a counterclaim would, as here, be subject to res judicata under this second exception, preclusion of that claim would nonetheless be inappropriate if the claim could not have been raised in the first proceeding.  See Kale v. Combined Ins. Co. of America, 924 F.2d 1161, 1167 (1st Cir. 1991).  As we discuss below, the Iannochinos could have raised their malpractice claims as a counterclaim to the fee application.  See Section III.B.3.b., infra.

[5]    The Iannochinos also contend on appeal that they were denied a full and fair opportunity to litigate their claims during the fee application.  They have raised this issue for the first time on appeal and therefore it is waived.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 259-60 (1st Cir. 1999).

[6]    We reject the Iannochinos' suggestion that their case falls within the narrow exception to the applicability of res judicata for cases involving an "unusual hardship."  See Rose v. Town of Harwich, 778 F.2d 77, 82 (1st Cir. 1985).  We see nothing in this case that would indicate that the ordinary application of res judicata to the Iannochinos would be "plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme."  Id. (quoting

-15-

## 1. Finality of the judgment

The question of whether the fee award was a final or an interim judgment presents an unusual degree of difficulty because, in contrast to most other civil litigation, finality in bankruptcy is a more elusive concept.  See In re Am. Colonial Broad. Corp., 758 F.2d 794, 801 (1st Cir. 1985).  To be final, a bankruptcy court order "need not resolve all the issues raised by the bankruptcy[, though it]must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief."  In re Integrated Res., Inc., 3 F.3d 49, 53 (2d Cir. 1993) (emphasis in original).  A bankruptcy court order must leave nothing to be done with respect to the claim except the ministerial supervision of the execution of the order.  See In re Am. Colonial Broad. Corp., 758 F.2d at 801.  An application for an award of fees for professional services is precisely such a discrete claim.  Consequently, in this context, "an interim award of attorney's fees under 11 U.S.C. § 330(a)(1) and 331 is not final" because the order does not fully resolve the attorney's claim, leaving open the possibility that the claim will later be enlarged through future fee applications.  In re Spillane, 884 F.2d 642, 644 (1st Cir. 1989).  On the other hand, a fee award that determines all of the compensation owed to an attorney under section 330 may be considered final.  See id.  The determination of whether an award was

Restatement (Second) of Judgments § 26(1)(d)).

-16-

or was not final, by its nature, "depends upon the circumstances of the case."  In re Dahlquist, 751 F.2d 295, 297 (8th Cir. 1985).

The Iannochinos argue that Aframe created a genuine issue of material fact by indicating on the fee application that he was seeking only an interim rather than a final award.  The application begins with Aframe's assertion that he was the attorney of the debtor in the Chapter 13 bankruptcy.  By this statement, the Iannochinos contend, Aframe admitted that he was continuing to represent them.  Because representation was continuing, a factfinder could reasonably conclude that there would be future requests for compensation.  This conclusion is bolstered, they argue, by the reference in the application to section 331, which is the section of the bankruptcy code applicable solely to interim compensation.

Stripped of their context, these two references in the fee application render superficial support for the Iannochinos' position.  We cannot, however, simply examine isolated fragments from a fee application to create a factual dispute if none reasonably exists when the application is viewed in its full context.  After examining the full circumstances surrounding the fee application, we conclude that a reasonable factfinder could only determine that the order here was final.

In his fee application, Aframe sought reimbursement for services that extended into August, even though his application was

captioned "Chapter 13" and the bankruptcy had been converted to Chapter 7 in April. The bankruptcy court, however, explicitly denied the application insofar as it sought fees for services provided after the conversion. This approach suggests that even if representation had continued, neither defendant would have been entitled to further fee awards. In the present case, however, representation did not continue. Despite Aframe's assertion in the fee application that he was the attorney of the debtor, the only reasonable conclusion from the record is that Aframe was not the Iannochinos' attorney at the time of the application. The Iannochinos themselves lend support to this conclusion. Their opposition to the fee application was based in part upon the assertion that they owed no fees to Aframe because, though they had hired Rodolakis, they "never retained Carl D. Aframe as counsel." Indeed, they claimed an express understanding at the time of Rodolakis's retention that Rodolakis–and not Aframe–was their attorney.[7]

Moreover, when read in context, the fee application does not indicate that Aframe was continuing to represent the Iannochinos. Aframe asserted that he was the attorney for the debtor "in this proceeding," which the caption references as the Chapter 13 bankruptcy

_____

[7] The Iannochinos also alleged that the fee application was in violation of Rodolakis's assurances to them that he would not seek payment for his representation of them "in your Chapter 7." The record does not offer any explanation for the bankruptcy court's refusal to award fees for the Chapter 7 services. In doing so, however, the bankruptcy court effectively enforced Rodolakis's promise as reported by the Iannochinos.

action.  The Chapter 13 action had concluded upon the conversion to Chapter 7 several months prior to the application.  Although Aframe did seek fees for services performed after the conversion of the case, he did not seek any fees for the time after Rodolakis, and by extension, his firm had withdrawn from the case.  In this context, Aframe's recitation of his employment status is simply a statement that he was entitled to an award of attorney's fees because he had been employed by the Iannochinos at the time the services had been rendered.  Indeed, the only reasonable conclusion from the record evidence is that Aframe represented the Iannochinos purely through his partnership relationship with Rodolakis.  When Rodolakis withdrew from the case, Aframe's professional relationship with the Iannochinos also terminated.  The discharge of an attorney prior to an order approving a fee application indicates that no further services will be rendered and consequently that no further applications will be made.[8]  See In re Spillane, 884 F.2d at 645.

The mere reference to section 331 also does not undercut the finality of the order on attorney's fees.  Though the Iannochinos are

---

[8]     The Iannochinos also argue that Rodolakis's later re-entry into the case must mean that the fee award was an interim judgment, as least as to Rodolakis.  There is no merit to this contention.  A reasonable factfinder could only conclude from this record that Rodolakis's re-entry was neither contemplated at the time of the fee application nor in any way a continuation of the original representation.  Such an unrelated subsequent event has no bearing upon whether the award was or was not a final judgment.

correct that section 331 only applies to interim compensation,[9] and thus there is no reason to reference it in an application for a final award of fees, we decline to allow a mere statutory reference to determine the actual nature of the fee request, particularly when section 331 was mentioned here in conjunction with the more general, final compensation provisions of section 330. See In re Yermakov, 718 F.2d 1465, 1469 (9th Cir. 1983) (holding fee order was final despite explicit reference in the order to future fee applications). As the bankruptcy court's order determined all issues related to the defendants' claim for fees, the order was final and may be given res judicata effect.

## 2. Identity of the parties

The Iannochinos' challenge to the identity of the parties is confined to Rodolakis. They note that Rodolakis had withdrawn from the case by the time of the fee application and award and that Aframe applied for the fees in his name only. Therefore, they contend, Rodolakis was not in privity with Aframe and cannot now gain any

---

[9]     Section 331, entitled "Interim compensation," provides: A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and disburse to such applicant such compensation or reimbursement. 11 U.S.C. § 331 (1993).

benefit from whatever res judicata effect might attach to the fee award.

The record does indicate that Rodolakis and Aframe ceased to be law partners at some point after Rodolakis stopped representing the Iannochinos and withdrew from the case. Though the precise date of that split is unclear, the fee application came from Aframe's solo practice rather than from the firm of Aframe and Rodolakis. We can reasonably infer, therefore, favorably to the Iannochinos, that Rodolakis was not a party to the fee application. This inference, however, does not stretch as far as the Iannochinos urge. Nonparties may gain the benefit of a prior litigation if they were in privity with a party to the previous action. See Gonzales v. Banco Central Corp., 27 F.3d 751, 756 (1st Cir. 1994). Though privity is an elusive concept, we have found privity "if a nonparty either substantially controlled a party's involvement in the initial litigation or, conversely, permitted a party to the initial litigation to function as his de facto representative." Id. at 758.

Even drawing all reasonable inferences in favor of the Iannochinos, a reasonable factfinder could only conclude on this record that Aframe and Rodolakis were in privity because Aframe was acting as Rodolakis's de facto representative in pursuit of the legal fees. See, e.g., In re Belmont Realty Corp., 11 F.3d 1092, 1097; In re Medomak Canning, 922 F.2d 895, 901 (1st Cir. 1990). Aframe and Rodolakis were

-21-

law partners during the time that the services detailed in the fee application were provided to the Iannochinos. Rodolakis was potentially entitled to payment from the estate for those services. See 11 U.S.C. § 330. Aframe's fee application, though submitted from his office, did not limit itself to a claim for the services Aframe had rendered, but instead sought reimbursement for all services provided to the Iannochinos, irrespective of which attorney had provided the services. The amount sought was nearly $10,000. The overwhelming majority of this work had been performed by Rodolakis, who billed sixty hours to Aframe's six. Moreover, at some point shortly after the fee application was granted in March 1995, Rodolakis had a chance meeting with the Iannochinos in the bankruptcy court during which they discussed the ongoing bankruptcy.[10] Peter Iannochino testified in deposition that Rodolakis told the Iannochinos at this meeting that he was due to receive twenty percent of the compensation awarded pursuant to the fee application. This statement confirms that Aframe was Rodolakis's de facto representative in filing the fee application. Consequently, the defendants have established the identity of parties element of res judicata.

**3. Identity of the causes of action.**

---

[10] After this meeting, Rodolakis agreed to represent the Iannochinos for a second time, though this period of representation was relatively short, lasting less than six months.

In determining whether "causes of action are sufficiently related to support a res judicata defense," we have "adopted a transactional approach." Mass. Sch. of Law, Inc. v. American Bar Assoc., 142 F.3d 26, 38 (1st Cir. 1998). We have relied upon the three factors set forth in the Restatement to guide our analysis of whether two claims are actually part of a single cause of action. See Porn v. Nat'l Grange Mut. Ins. Co., 93 F.3d 31, 34 (1st Cir. 1996). Though none of these factors is determinative, and the three factors do not exhaust all factors that may be considered, they provide a helpful framework for analyzing the Iannochinos' contentions. See id. First, we look to "whether the facts are related in time, space, origin or motivation," second, to "whether they form a convenient trial unit," and third, to "whether their treatment as a unit conforms to the parties' expectations." Id. (quoting Restatement (Second) of Judgments § 24 (1982)).

Before turning to a discussion of those elements, however, we note that the Fifth Circuit has found identity of cause of action upon facts that are essentially identical to those in this case. See In re Intelogic Trace, Inc., 200 F.3d 382, 387 (5th Cir. 2000). In Intelogic Trace, a Chapter 11 debtor had hired an accounting firm to assist it in various accounting matters connected with the bankruptcy. See id. at 384. Shortly after the reorganization plan was confirmed and before the firm's fee application was approved, the debtor

discovered errors in the services the firm provided. <u>See</u> <u>id.</u> The debtor nonetheless declined to proceed on a malpractice claim, preferring instead to negotiate a reduction in the fees from the firm. <u>See</u> <u>id.</u> The bankruptcy court approved the application, with the negotiated reduction. <u>See</u> <u>id.</u> at 385. When, months later, the reorganization plan failed and the debtor again entered bankruptcy under Chapter 7, the Chapter 7 trustee initiated a malpractice action in state court against the accounting firm. <u>See</u> <u>id.</u> After this action was removed to the bankruptcy court, it agreed that res judicata barred the malpractice claim and granted summary judgment. <u>See</u> <u>id.</u> at 385-86. The Fifth Circuit affirmed. <u>See</u> <u>id.</u> at 387. The <u>Intelogic Trace</u> court's reasoning on these issues is persuasive and we refer to it throughout our discussion of the <u>Restatement</u> factors.

**a. The factual relationship between the fee application and the malpractice claim.**

The Iannochinos do not mount a serious challenge to the factual similarities between the two claims. Nor could they. As the <u>Intelogic Trace</u> court noted, the bankruptcy court must undertake a comprehensive evaluation of the services listed in a fee application when determining whether to award fees. Under section 330, the bankruptcy court must consider "the nature, the extent, and the value of such services." 11 U.S.C. § 330(a)(3)(A).[11] A bankruptcy court

---

[11]     Section 330 provides in pertinent part:

-24-

therefore makes an implied "finding of quality and value" in the professional services provided to the Iannochinos during the bankruptcy. Intelogic Trace, 200 F.3d at 387. Likewise, the Iannochinos' malpractice claim entails the same concern, as their allegations of malpractice arise from the defendants' legal advice relating to the bankruptcy. It was this legal advice that formed the basis of Aframe's fee application. Thus, the central factual question in both claims is the same: What advice did the defendants give to the Iannochinos during the bankruptcy, and what was the quality and value of that advice?

**b. The two claims as a convenient trial unit.**

We examine whether the two claims form a convenient trial unit with an eye towards the conservation of judicial resources by

---

(a)(3)(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including--
 (A) the time spent on such services;
 (B) the rates charged for such services;
 (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
 (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
 (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
11 U.S.C. § 330(a)(3)(A).

preventing needless duplication of litigation.  See Porn, 93 F.3d at 36.  In contrast to the evaluation of the factual relationships we undertook above, this inquiry focuses upon what would happen at trial.  See Restatement (Second) of Judgments § 24 cmt. b (1982).  We determine whether the witnesses or proofs required to prove the factual basis of both claims substantially overlap.  See Mass. Sch. of Law, 142 F.3d at 38 ("[W]here the witnesses or proof needed in the second action overlap substantially with those used in the first action, the second action should ordinarily be precluded.") (quoting Porn, 93 F.3d at 36). The Iannochinos argue that the proof is different, pointing primarily to the necessity of expert witnesses for their malpractice claims.  This contention, however, ignores the essential nature of the bankruptcy court's examination of the fee application.  Although no experts are called in a fee hearing, this does not mean that there is no expert evaluation of the services rendered in this case.  The bankruptcy court has directly seen the results of the attorney's work for which a fee award is requested.  Moreover, a "judge is presumed knowledgeable as to the fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys; these presumptions obviate the need for expert testimony such as might establish the value of services rendered by doctors or engineers."  In re W.J. Servs., Inc., 139 B.R. 824, 828 (S.D. Tex. 1992).  To the extent that the malpractice claim would require an expert witness or witnesses not

-26-

required by the fee hearing, this difference in proof does not eliminate the substantial overlap of the remaining proofs required to determine the essential issue in both claims, namely the quality of the defendants' legal services to the Iannochinos.

Of course, this substantial overlap between the proof required for each claim would not matter for the purposes of res judicata if the Iannochinos could not have brought their malpractice claim in opposition to Aframe's fee application. See Kale v. Combined Ins. Co. of Am., 924 F.2d 1161, 1167 (1st Cir. 1991) (noting that res judicata cannot bar a claim that could not have been raised in the first action). Though the Aframe fee application was a contested matter in bankruptcy, this does not mean, as the Iannochinos contend, that the bankruptcy court's evaluation of the fee application would be limited to a purely administrative analysis of the fees, leaving it no authority to undertake a full trial--including a potential award of damages--on the malpractice claim. Indeed, the Intelogic Trace court has directly addressed the powers of the bankruptcy court in this context: "Although the fee hearing was a contested matter [the] fee application was a claim against [the debtor]. Had [the debtor] objected to the fee application and included with its objection a claim for affirmative relief on account of alleged malpractice, the matter would have become an adversary proceeding." In re Intelogic Trace, Inc., 200 F.3d at 389-90 (citations omitted). The bankruptcy rules

-27-

specifically provide for objections "to the allowance of a claim," a provision that the Iannochinos used by filing their initial objection to the application. See Fed. R. Bankr. P. 3007. Furthermore, when an objection is combined with a demand for monetary damages under this rule, as in a professional malpractice claim, the fee hearing "becomes an adversary proceeding" in which these issues may be addressed. Fed. R. Bankr. P. 3007 (providing for an adversary proceeding when "an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001"); see also Fed. R. Bankr. P. 7001(1) (defining "a proceeding to recover money or property" as an adversary proceeding). The fact that the Iannochinos did not take advantage of these procedures does not alter the fact that they could have done so and thus tried the malpractice claim at the time of the fee application.

**c. The parties' expectations at the time of the fee application.**

Finally, we examine whether treating these two claims as a single trial unit would conform to the parties' expectations. In assessing the parties' litigation expectations, we look to the parties' knowledge at the time of the first suit on the underlying facts. See Porn, 93 F.3d at 37. The Iannochinos contend that at the time of the fee application they did not know that Rodolakis and Aframe might have violated their duty of care towards them. As laypersons, they say, they would have little idea about the standards governing the legal

profession, and thus they had no way of knowing whether the defendants had breached those standards. Without this knowledge of a breach of duty, the Iannochinos contend, they could not have known that they had a malpractice claim against the defendants. We disagree. When evaluating the parties' expectations, we are guided by the principle that, where "two claims arose in the same time frame out of similar facts, one would reasonably expect them to be brought together." Id. Therefore, rather than considering whether the Iannochinos knew of the precise legal contours of their malpractice claim at the time of the fee application, we must instead determine whether they knew of the factual basis of that claim.

The Iannochinos point to three areas in which they claim Rodolakis gave them substandard advice: his advice to repudiate the Kwik Kopy franchise agreement, to ignore the Clark University lawsuit, and to enter into the bankruptcy. Although the Iannochinos may not have had any reason to question this advice when given, their situation at the time of the fee application necessarily changed the reasonable perception of these events. By that time, their relationship with their attorney had broken down. Indeed, Rodolakis withdrew from the case because "there [was] no effective attorney/client relationship between counsel and the Debtors." In each instance, the advice the Iannochinos now claim was improper resulted in almost immediate negative results. After the Iannochinos removed all Kwik Kopy indicia

-29-

from the Iannochinos' print store and opened under another name, Kwik Kopy took aggressive actions to enforce its rights under the franchise agreement, including requesting relief on multiple occasions from the automatic stay so that it might enforce the non-compete provision of the contract. Likewise, their inaction on the Clark University lawsuit quickly resulted in a default judgment. Indeed, the record indicates that the Iannochinos were upset about the Clark lawsuit and felt that they should not ignore what they thought were their valid counterclaims to that action. Furthermore, by the time of the fee application, the bankruptcy had been converted from Chapter 13 to Chapter 7. This conversion surely brought with it a similar reevaluation of whether it had been appropriate to file for bankruptcy in the first instance. Accordingly, the Iannochinos knew all "the facts necessary for bringing" their malpractice claim at the time of the fee application, and we think it reasonable for Aframe and Rodolakis to expect that all concerns about the quality of their services would have been raised in response to the fee application. See Porn, 93 F.3d at 37 ("Defendants may reasonably demand that disposition of the first suit establish repose as to all matters that ordinary people would intuitively count part of a single basic dispute.") (quoting 18 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 4407 at 56 (1981)).

We are mindful that the Iannochinos were unrepresented at the time of the fee award. The Iannochinos emphasize this fact, arguing

that this distinguishes them from the debtor in <u>Intelogic Trace</u>.
Although the debtor in that case was represented at the time of the
accounting firm's fee application, that fact is not determinative.
Indeed, the breakdown of the attorney/client relationship here is
further evidence that the Iannochinos should have raised their
malpractice claims as objections to the fee award.  We reject the
suggestion implicit in their argument that parties can ignore facts
indicating that they should assert a malpractice claim solely because
of a lack of representation.

## IV. Conclusion

Because all of the elements of res judicata are present here,
the bankruptcy court was correct in holding that the Iannochinos'
malpractice claim was barred.

**<u>Affirmed.</u>**