ROBOTIC VISION SYSTEMS, INC.
(n/k/a Acuity CiMatrix, Inc.) and
Auto Image ID, Inc., Debtors.

Pat V. Costa, Appellant,

v.

Robotic Vision Systems, Inc. (n/k/a Acuity CiMatrix, Inc.), Auto Image ID, Inc., United States Trustee, Dreier LLP, Sheehan Phinney Bass + Green, P.A., Marotta, Gund, Budd & Dzera, LLC, Murtha Cullina LLP, Mesirow Financial Consulting LLC, and Steven M. Notinger, Chapter 7 Trustee, Appellees.

BAP No. NH 06–027.
Bankruptcy Nos. 04–14151–
JMD, 04–014152–JMD.

United States Bankruptcy Appellate Panel
of the First Circuit.

March 21, 2007.

Charles A. Dale, III, Elisabeth Schreuer, Boston, MA, on brief for Appellant.

Terence D. Watson, New York City, on brief for Appellee Dreier LLP.

Robert A. White, Olga L. Bogdanov, Worcester, MA, on brief for Appellees Murtha Cullina LLP and Mesirow Financial Consulting LLC.

Before LAMOUTTE, HAINES, and CARLO, United States Bankruptcy Appellate Panel Judges.

HAINES, Bankruptcy Judge.

We confront Pat V. Costa's appeal from the bankruptcy court order overruling his "Omnibus Objection to Final Applications for Compensation" of certain estate professionals. That order rejected Costa's contention that the professionals' allowed fees could not lawfully be paid from certain "carve-out" funds established for that purpose under previously-entered court orders. We first must consider whether appellate jurisdiction attaches to Costa's appeal. We then conclude that, although establishing an exclusive fund to pay certain administrative claims—potentially at the expense of other claims of equal priority—may be problematic, Costa, who was an express proponent of the dedicated fund in the early days of the case, cannot prevail here.

### Background

On November 19, 2004, Robotic Vision Systems, Inc., ("Robotics") and Auto Image ID, Inc., ("Auto Image")[1], filed for protection under Chapter 11 of the Bankruptcy Code.[2] The cases were jointly administered.

Consistent with Code § 363(c), the debtors sought authority to use cash collateral, then encumbered by liens in favor of RVI Investors, LLC ("Investors"); Intel Corporation ("Intel"); and Costa.[3] The matter was resolved by agreement (expressly assented to by Costa).[4] The cash collateral order set up a "Carve–Out," intended to

---

1. We will refer to Robotics and Auto Image collectively as "the debtors." Although their cases were not substantively consolidated, their secured debt structures were essentially identical insofar as is material here.

2. References to the "Bankruptcy Code" or the "Code" denote the Bankruptcy Reform Act of 1978, as effective at the time of the bankruptcy filing, 11 U.S.C. § 101 et seq. The Code amendments effected by 2005's Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") do not apply.

3. See Ex Parte Emergency Motion for Order Authorizing Use of Cash Collateral, seeking entry of an order providing cash collateral authority; providing adequate protection to Investors, Intel, and Costa; and establishing the Carve–Out.

4. See id. at ¶ 17 ("Mr. Costa consents to the relief requested in this Motion").

fund payment of certain estate professionals. The order provided:

> The term "Carve–Out" shall mean an amount equal to the aggregate weekly line item amounts as provided in the Budget for the Debtor's professionals (and, to the extent amended, counsel for the [Creditors'] Committee) (collectively, the "Professionals") for the period through the Termination Date. All pre-petition retainers and any other unencumbered property of the estate shall be used to pay any allowed fees and expenses of the Professionals before any payment of such fees or expenses are made from the Carve–Out. The Carve–Out shall also include the claim of the United States Trustee for fees payable under 28 U.S.C. § 1930. Agent shall have the right to establish reserves under the Prepetition Credit Facility for the accrued and unfunded portions of the Carve–Out. Upon the Termination Date, and with the exception of the accrued but unfunded portion of the Carve–Out incurred in accordance with the Budget prior to the Termination Date, Lender shall have no obligation to fund any Carve–Out for amounts incurred in excess of the aggregate of the weekly line items for the period prior to the Termination Date ... Nothing herein shall be construed as consent to the allowance of any fees or expenses of the Professionals or shall affect the rights of the Lender to object to such amount. In exchange for the Carve–Out, none of Agent, Lender or any of their respective interests in property of the estate shall be, with respect to any fees, expenses or charges incurred by the Professionals, subject to the surcharge provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including unjust enrichment).

Cash Collateral Order dated November 24, 2004 (Doc. No. 46) at ¶ 13, quoted in Appellant's Brief at 3.[5]

The Cash Collateral Order was amended and extended multiple times, without objection by Costa, in ways that did not affect the Carve–Out's substance. Following sales of substantially all of the debtors' assets, their cases were converted to Chapter 7.[6] The conversion order expressly addressed the Carve–Out fund and mandated its preservation for the Chapter 11 professionals "who were the intended beneficiaries of such carveouts pursuant to the terms of Cash Collateral Orders previously approved" by the bankruptcy court.[7] Subsequently, those Chapter 11 professionals filed final fee applications seeking payment of their fees from the Carve–Out and, to the extent the Carve–Out would be insufficient to answer for them, allowance as Chapter 11 administrative expenses.[8]

Costa filed specific objections to several of the fee applications, notably those of Drier LLP ("Drier") (debtors' counsel); Marotta, Gund, Budd & Dzera ("MGBD") (debtors' crisis manager); and Murtha Cullina LLP ("Murtha") (creditors' com-

---

**5.** Costa does not assert that the procedural requirements of Fed. R. Bankr.P. 4001 were in any respect unmet.

**6.** *See* Partially Assented to Order on Motion by the Official Committee of Unsecured Creditors to (i) Convert Cases to Chapter 7; (ii) Set Bar Dates; (iii) Provide for Compliance with Bankruptcy Rule 1019; and (iv) Authorize Payment of Principal to Intel Corporation and Middlefield Ventures LLC with Respect to Their Debtor–In–Possession Financing, dated October 19, 2005 (Doc. No. 1462).

**7.** *Id.* at 2.

**8.** At oral argument, counsel agreed that the Carve–Out fund, with a balance of approximately $ 700,000, would be insufficient to satisfy its beneficiaries' fees, which far exceed that sum.

mittee counsel). He also filed the Omnibus Objection, described in the following terms: *"In addition to his individual objections to various final fee applications, ... Pat V. Costa ('Costa') filed the Omnibus Objection....* The Objection opposes any payment to the applicants from carveouts established under various cash collateral orders for the Applicants' benefit" [9] by the Cash Collateral Order. The Omnibus Objection took issue with payment of two professionals, Sheehan Phinney Bass + Green, P.A. ("Sheehan") (debtors' local counsel); and Mesirow Financial Consulting LLC ("Mesirow") (financial consultant to the creditors' committee), as to whom Costa had lodged no other objection.

The bankruptcy court overruled Costa's Omnibus Objection by its order dated June 7, 2006. That order, from which this appeal was taken, disposes of no issues beyond the Omnibus Objection's·contention that the Carve–Out could not lawfully be utilized to pay professional fees.[10]

### Jurisdiction

▮ A bankruptcy appellate panel is duty-bound to determine its jurisdiction before proceeding to the merits even if the parties do not address the issue. *See In re George E. Bumpus, Jr. Constr. Co.*, 226 B.R. 724 (1st Cir. BAP 1998). We have jurisdiction to hear appeals from "final judgments, orders and decrees ... or with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under § 157 of this title." 28 U.S.C. § 158(a); *see also Fleet Data Processing Corp. v. Branch (In*

*re Bank of New England Corp.)*, 218 B.R. 643, 645 (1st Cir. BAP 1998). "A decision is final if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Bank of New England*, 218 B.R. at 646. An interlocutory order "'only decides some intervening matter pertaining to the cause, and which requires further steps to be taken in order to enable the court to adjudicate the cause on the merits.'" *Id.* (quoting *In re American Colonial Broad. Corp.*, 758 F.2d 794, 801 (1st Cir.1985)).

An order allowing or disallowing a final fee application is a final order that supports appellate jurisdiction. *See In re DN Assocs.*, 3 F.3d 512 (1st Cir.1993); *see also In re Narragansett Clothing Co.*, 210 B.R. 493 (1st Cir. BAP 1997); *In re Delta Petroleum (P.R.), Ltd.*, 193 B.R. 99 (D.P.R. 1996).

Here, although the order Costa appeals from disposed of one *issue* pertaining to several fee applications, it did not finally dispose of any application then pending before the court. Generally, appellate jurisdiction cannot be founded on such an interlocutory ruling.

As a consequence, following oral argument, we issued an order requiring Costa to show cause why his appeal should not be dismissed. His response, as well as the response filed by Murtha, illuminates the record substantially, if not satisfactorily.[11] Once the bankruptcy court disposed of the Omnibus Objection, it proceeded, by separate order, to address the fees of Mesi-

---

9. Order Overruling Pat V. Costa's Omnibus Objection, dated June 7, 2006. (Emphasis added.)

10. Order dated June 7, 2006; Notice of Appeal dated June 16, 2006.

11. Although, in addition to counsel's narratives, the responses appended copies of orders and rulings, most were undated and none were formally made part of the record on appeal. This is understandable, since all were issued *after* the order from which Costa appealed.

row,[12] Murtha,[13] and Sheehan.[14] Indeed, the bankruptcy judge overruled Costa's other objections to the Murtha and Mesirow fees the same day he overruled the Omnibus Objection. Those rulings (regarding Murtha and Mesirow) were not, however, final orders. They merely overruled Costa's objections and directed the Chapter 7 trustee to submit final orders directing payment.[15]

The final order awarding fees to Sheehan, entered some weeks later, includes the following paragraph:

> Pat V. Costa has previously appealed the validity of the Carve–Out as applicable to the Debtor's professionals, which appeal is pending. The court reserves jurisdiction concerning the priority of Sheehan's interest in the Sheehan CarveOut Funds authorized to be paid hereunder, with Sheehan's consent and *without the necessity of Costa having to file a separate appeal from this order.* In the event that a final, nonappealable order determines that another party's interest in the Sheehan Carve–Out Funds was, as of the date hereof, superior to that of Sheehan, Sheehan shall pay over to the Trustee such amount of the Carve–Out Funds so received as such order may require. In the event that any portion of the Sheehan Carve–Out

Funds is so paid, that amount shall be added to the remaining Chapter 11 Administrative Expense claim allowed . . . above.

Order Approving Trustee's Settlement Agreement With and Awarding Final Fees and Expenses to Sheehan Phinney Bass + Green (Doc. No. 1761) (emphasis added).[16] Later, the bankruptcy court entered its order directing payment of the Murtha and Mesirow fees, in part, from the share of the Carve–Out set aside for them, and directed that certain other Carve–Out funds, previously allocated for creditors' committee professionals, be released to the Chapter 7 trustee.[17] That order contained a "savings clause," substantially similar to that quoted above, reserving jurisdiction in the event of remand and excusing the necessity of Costa filing a "new" notice of appeal.[18]

■ Still and all, our jurisdictional concerns abide, even after reviewing the documents proffered in response to our show cause order. Plainly, the *final orders* allowing professional fees incorporated the bankruptcy court's June 7, 2006, order overruling Costa's Omnibus Objection to using the Carve–Out to pay them. But that order itself was not the final order on

---

12. Order dated June 7, 2006 (Doc. No. 1716). The order concluded:

> For the reasons set forth in a separate order of even date, Costa's objection to the payment of [Mesirow's] fees and expenses from the carve-out established by prior orders of the is court has been overruled. Accordingly, [Mesirow] may receive payment from the carve-out.
>
> *The trustee is hereby ordered to submit a proposed order* awarding the final fees and expenses as indicated above, directing payment from the carve-out, and setting forth the amount of any remaining administrative expense claim.

13. Order dated June 7, 2006 (Doc. No. 1717) (emphasis supplied). With reference to the carve-out and past rulings, the order contains identical language as that quoted in the preceding paragraph.

14. Doc. No. 1761.

15. *See* documents referred to in footnotes 12 & 13, *supra.*

16. Order dated July 25, 2006 (Doc. No. 1761).

17. Order dated August 17, 2006 (Doc. No. 1781).

18. *Id.* at ¶ 7.

*any* fee application.[19] Given that Costa improvidently appealed the June 7, 2006, ruling, could the bankruptcy judge save his bacon by including language in the final orders that purported to validate the premature appeal and to relieve Costa of the necessity of appealing final orders?[20] Even though they are not part of the record on appeal, should we accept and consider the documents and representations lately submitted in support of jurisdiction?

We do not doubt this jurisdictional jigsaw holds fascination for enthusiasts. We recognize our duty not to adjudicate without a sound jurisdictional footing. Yet here we conclude that we may dispose of Costa's appeal on the merits without piecing together the entire puzzle. This is a matter of statutory appellate jurisdiction and, as appellant, Costa is the party invoking it. His appeal can easily be resolved against him on the weakness of his own arguments. Under such circumstances, we may leave the puzzle parts as they lay and proceed post haste to the merits. *See Miles v. Beneficial Massachusetts, Inc. (In re Miles)*, 436 F.3d 291, 293–94 (1st Cir.2006); *Restoration Pres. Masonry, Inc. v. Grove Europe, Ltd.*, 325 F.3d 54, 59 (1st Cir.2003).

### Merits

We recognize that the Carve–Out operated effectively to obtain for the debtors an ability to fund professional fees essential to administering the estate. In return for making the funds available, the secured lenders exacted *quid pro quo: e.g.*, waiver of the debtors' surcharge rights and restrictions prohibiting the funding of some activities (adverse to the lenders) which the professionals might pursue.

■ Such agreements (and concessions) are the warp and woof of reorganization practice. That early (so called "first day") orders contain much of it—and that it can affect inalterably the course of a case (including the rights of third parties not privy to the negotiation) is one reason for the procedural safeguards of Fed. R. Bankr.P. 4001 (limiting extent of relief available on less than full notice).[21] Cash collateral orders generally authorize use of secured lenders' liquid collateral for limited purposes, usually as reflected by a debtor's projected operating budget. Of course, the reorganizational effort requires services of bankruptcy professionals. Lenders often agree, or, conditions permitting,[22] bankruptcy courts will authorize over objection, the use of cash collateral to fund such professional services. A "carve out" arrangement such as we see here, or a variation of it, is a fairly common convention.[23]

---

**19.** The final order on Sheehan's fees did not issue until July 25, 2006 (Doc. No. 1761) and the final order on the Murtha and Mesirow fees did not issue until August 17, 2006 (Doc. No. 1781). Other fee applications affected by the June 7, 2006, Carve–Out ruling were dealt with even later, or may still pend.

**20.** We think not. In the bankruptcy milieu, it is the first-tier appellate forum, not the trial court, that exercises authority to permit an interlocutory appeal to proceed. *See* 28 U.S.C. § 158(a)(3); *see generally In re Bank of New England*, 218 B.R. at 648–49.

**21.** Fed. R. Bankr.P. 4001 provides, in pertinent part:

(b) Hearing. The court may commence a final hearing on a motion for authority to use cash collateral no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a preliminary hearing before such 15 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

**22.** *See* § 363(c), (d), & (e).

**23.** "Although the term is widely used but rarely defined, a 'carve-out agreement' is generally understood to be 'an agreement by a party secured by all or some of the assets of

■ Bankruptcy courts have occasionally grappled with the problems carve-out arrangements present, but there is no broad body of consistent opinion. *See In re U.S. Flow*, 332 B.R. 792 (Bankr. W.D.Mich.2005) (holding that carve-out funds were insulated from the Code priority scheme, and as such were not "property of the estate" subject to *pro rata* distribution among all administrative claimants of an administratively insolvent estate); *but see In re World Waste Services, Inc.*, 345 B.R. 810 (Bankr.E.D.Mich.2006) (disgorgement is an appropriate remedy where necessary to ensure that some or all of a group of "similarly situated" administrative claimants receive like treatment)[24] We acknowledge the fundamental principle that equal priority creditors are to be treated equally. *World Waste Services*, 345 at 816; *see also In re Chute*, 235 B.R. 700, 701 (Bankr.D.Mass.1999) (acknowledging the power and discretion of bankruptcy courts to disgorge professional fees

"in order to achieve a pro rata distribution to administrative claimants in administratively insolvent cases."); *In re Kingston Turf Farms, Inc.*, 176 B.R. 308, 310 (Bankr.D.R.I.1995) (requiring disgorgement "as a matter of law, just to adhere to the mandatory payment scheme of the Code, i.e., to ensure that all creditors of the same class share pro-rata in the available pool of funds."); 4 Lawrence P. King, *Collier on Bankruptcy* 503.03[7], at 503–19 (15th ed. rev.2006) ("Some language in certain cases might suggest that all administrative claims, including ordinary course administrative claims, are subject to disgorgement if there proves to be insufficient funds in the estate at the end of the case to pay in full all administrative claims.") But, for today, we need not consider the extent, if any, that a carve-out mechanism, created in an order entered early in a reorganization case, may permissibly alter that principle.[25]

the estate to allow some portion of its lien proceeds to be paid to others, i.e., to carve out of its lien position.'" *In re U.S. Flow Corp.*, 332 B.R. at 796, citing *In re White Glove, Inc.*, 1998 WL 731611 at *6 (Bankr.E.D.Pa. Oct. 14, 1998). *See also* James S. Cole, *The "Carve Out" From Liens and Priorities to Guarantee Payment of Professional Fees in Chapter 11*, 1993 DETCLR 1499, 1518 (1993) ("The carve out is intended to guarantee that a lien or super-priority will not reach certain funds, usually up to a maximum dollar amount, in order that professional fees can be paid … justification for the carve out has rested upon a general appeal to the needs of the bankruptcy system, not upon the Bankruptcy Code.")

24. The Bankruptcy Code's distribution scheme establishes a "hierarchy of creditors", at the top of which, until recently, were "administrative claimants." *See* Code §§ 502, 507(a) In instances where multiple administrative claimants exist, each is "similarly situated" to the others. *Specker Motor Sales Co. v. Eisen*, 393 F.3d 659, 662 (6th Cir.2004). The 2005 amendments to the Code, not applicable in this case, elevated certain domestic support claims over administrative expenses. *See* 11 U.S.C. 507(a)(1)(A) (establishing the

first priority of certain "(a)llowed unsecured claims for domestic support obligations.")

25. We recognize that there is much to disagree about regarding the permissibility of a carveout that, like the one here, dedicates funds to the payment of specific professionals. The arrangement is far different than one in which a secured creditor agrees that cash collateral may be utilized for the estate's benefit generally (which would theoretically provide equal payment to all administrative claimants, not just professionals). Commonly, a carve-out entails a secured creditor's agreement to diminish its collateral and to waive certain statutory protections. *U.S. Flow* at 796 (terming such an arrangement a "true carve-out"); *see also In re White Glove, Inc.*, 1998 WL 731611 (Bankr.E.D.Pa.); *cf. In re SPM Mfg.*, 984 F.2d 1305, 1313 (1st Cir. 1993) (secured creditor has the right to share its proceeds with unsecured creditors, even when an outstanding priority claim exists, because "creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors.") Here, the Carve–Out was created out of the lenders' collateral, but

■ Rather, our decision today turns on the timing of Costa's objection and the procedural context in which it is set. Costa had ample opportunity to be heard regarding the Cash Collateral's substance and its subsequent execution. The Omnibus Objection came too late and smacks of sour grapes. We will not indulge it.

Costa expressly consented to and consistently supported the Carve–Out from its inception. Only in this late hour, after estate professionals have received payment and Costa himself has been privy to its benefits, does he challenge the Carve–Out's validity. We doubt Costa would complain were he sure there would be sufficient funds on hand to answer for his administrative claims. Allowing Costa to successfully contradict his earlier position would deal him an "unfair advantage," undercutting the "judicial integrity and efficacy" of the bankruptcy court. *Patriot Cinemas Inc. v. General Cinemas Corp.*, 834 F.2d 208, at 212, 214 (1st Cir.1987). Such a result would disrupt established judicial principles and a body of settled case law to the contrary.

This circuit has long recognized the use of judicial estoppel as a means of thwarting the unsavory result of rewarding a party who strategically employs contradictory positions in a legal proceeding. *See Patriot Cinemas*, 834 F.2d at 211–12, quoting *Davis v. Wakelee*, 156 U.S. 680, 15 S.Ct. 555, 39 L.Ed. 578 (1895) ("Where a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position."); *see also Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 12 (1st Cir.1999) (the twin goals of judicial estoppel are "to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies"); *Gens v. Resolution Trust Corp.*, 112 F.3d 569, 572 (1st Cir.1997); *Casas Office Mach., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 676 (1st Cir.1994) (judicial estoppel requires that the party being estopped must have previously succeeded in asserting a position inconsistent with the one it currently espouses); *In re Jackson Brook Inst., Inc.*, 280 B.R. 1 (D.Me. 2002) (the First Circuit employs judicial estoppel where necessary to avoid conferring an unfair advantage on litigants who intentionally engage in self-contradiction).

■ As an equitable doctrine, judicial estoppel may be invoked at the court's discretion.[26] Courts consider the following

at no cost to (that is, no reduction of) their secured claims. *See* Order dated November 24, 2004 (Doc. No. 46) and Omnibus Objection dated April 7, 2006 (Doc. No. 1609 ¶ 24). Thus, and particularly if Costa's contention that the secured creditors will be paid in full proves out, the Carve–Out's creation effectively removed estate funds from the Code's priority scheme and dedicated those funds exclusively for the benefit of designated professionals. If Costa's next assertion, that the estate is administratively insolvent, proves true, that means that those professionals will receive a greater share of their administrative claims than other administrative claimants. The contention that the Cash Collateral Order disrupts the priority order established in the Bankruptcy Code is a forceful one. We can envision a potent challenge being mounted by, say, an administrative trade creditor who was not part of the case when the order creating such a carve-out was noticed, heard, and approved. After all, bankruptcy convention does not trump due process. *Cf. In re Savage Indus., Inc.*, 43 F.3d 714 (1st Cir. 1994). For now, we will not opine how a properly executed challenge to the enforceability of such an arrangement would fare.

**26.** In this instance, judicial estoppel is but one doctrine that, once employed, successfully dispels Costa's argument. Another is res judicata, which bars a claim if: (1) a final decision on the merits was made in an earlier action; (2) there exists identity between the causes of action in the two suits, and (3) identity exists between the parties in the two

factors when determining whether to employ the doctrine: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position; (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

Costa's current assertion that the Carve–Out is unenforceable clearly contradicts his previous position. He supported the Carve–Out at its creation. He failed to object to or appeal from the Cash Collateral Order or any of the orders implementing and amending it. When the bankruptcy court entered each of the various orders effecting the Carve–Out without resistance from Costa, it had no reason to question or predict a shift in acquiescence, particularly in light of the fact that Costa, along with the other secured creditors who agreed to the Carve–Out, was granted a replacement lien, and a potential super-priority administrative claim, in the same order he now disputes. The court-appointed beneficiaries of the Carve–Out relied on it throughout their terms. Had the Carve–Out not been in place, these professionals might have considered alternate courses of action at lesser risk to themselves, *U.S. Flow* at 797. For all these reasons, we feel compelled to employ judicial estoppel as a bar to Costa's objection to the Carve–Out.

Costa had every opportunity to negotiate or, if necessary, object to, the Carve–Out's terms. If the end result was unsatisfactory, he had opportunity to appeal. *See id.* at 797–98. He did not do so. Rather, he consented and subsequently acquiesced. The milk spilt long ago. It is too late for Costa now to cry.

The bankruptcy court's order overruling the Omnibus Objection is AFFIRMED.

suits. *See In re Iannochino*, 242 F.3d 36 (1st Cir.2001); *In re Fortier*, 161 Fed.Appx. 514 (6th Cir.2005). Here, the bankruptcy court made a final decision when it entered the order establishing the Carve–Out for the purpose of paying estate professionals. In bankruptcy, an order is considered final when only ministerial action remains for the court, *In re Saco Local Dev. Corp.*, 711 F.2d 441, 446 (1st Cir.1983), and when it "finally disposes of discrete disputes within a larger case." *Fortier* at 516, citing *In re Dow Corning*, 86 F.3d 482, 488 (1996). The order establishing the Carve–Out and the subsequent orders extending and amending the agreement were each final decisions which Costa had the right to appeal. The necessary element of identity between the parties is easily established here, rendering res judicata another avenue by which Costa's appeal is denied.